2000 SD 65

**Paul J. HOLZER and Marjorie J. Walters, Co–Guardians of the Person and Estate of Vernon Walter Holzer, Plaintiffs and Appellants,**

v.

**DAKOTA SPEEDWAY, INC., a South Dakota Corporation, and K & K Insurance Group, Inc., Defendants and Appellees.**

No. 21065.

Supreme Court of South Dakota.

Argued March 20, 2000.

Decided May 17, 2000.

David R. Gienapp and William H. Dietrich of Arneson, Issenhuth & Gienapp, Madison, South Dakota, Attorneys for plaintiffs and appellants.

Harlan A. Schmidt, Spearfish, South Dakota, Attorney for plaintiffs and appellants.

David J. Vickers and James E. McMahon of Boyce, Murphy, McDowell and Greenfield, Sioux Falls, South Dakota, Attorneys for appellee Dakota Speedway.

Thomas M. Frankman and Dana M. Van Beek of Davenport, Evans, Hurwitz and Smith, Sioux Falls, South Dakota, Attorneys for appellee K & K Insurance.

GILBERTSON, Justice

[¶ 1.] This case arose from a personal injury accident at the Lake County Speedway, when a race car's wheel detached, struck and injured Vernon Holzer [1] (Holzer). The circuit court granted both defendants, Dakota Speedway, Inc.[2] (Speedway) and K & K Insurance Group, Inc. (K & K) summary judgment based on a pre-accident release signed by Holzer. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] Speedway is located approximately three miles southwest of Madison, South Dakota. Its stock car races are open to the public. At the time of the accident, Speedway consisted of a grandstand, the racetrack itself, a pit area inside the racetrack, and a separate pit area outside the track. The racetrack was a ⅜ mile oval dirt track, on which stock cars raced in the standard counter-clockwise direction.

[¶ 3.] A pit is an area at a racetrack where tow vehicles, racecars and trailers are parked prior to racing and upon leaving the track. This area is also used for pre-race tune-ups, repairs and other operations. Frequently drivers, mechanics and other members of pit crews congregate there. The pit area in use on August 5, 1995 was an area south of, and outside of the southern edge of the track.

[¶ 4.] Holzer was serving as a member of Bruce Bortnem's pit crew on August 5, 1995, when an accident occurred during the ninth or tenth lap of the twelve-lap sportsmen's stock car feature race. The right wheel and tire broke away from a race car, became airborne, and flew over

---

1. This appeal is brought on behalf of Vernon Holzer by his co-guardians, Paul Holzer and Marjorie Walters (Holzer, collectively), as Vernon is in a coma.

2. Lake County Speedway is owned and controlled by Dakota Speedway, Inc. The two entities will be referred to together in this opinion as Speedway.

one hundred feet[3] to where Holzer was standing inside the official pit area behind a wall consisting of concrete barricades.[4] He received severe injuries to the head, face and shoulder, and has been in a comatose condition since the date of the accident. Arthur Nordstrom, technical advisor and inspector of late-model street stock cars and sportsmen stock cars at Speedway, stated in his affidavit that the wheel and tire came off because the bell assembly, which is part of the axle shaft, had fractured and broken off from the main portion of the axle shaft. Thus, parts of the bell, axle and brake were still attached to the tire and wheel when it broke loose and struck Holzer.

[¶ 5.] Before entering the pit area of the racetrack on August 5, 1995, Holzer was requested by Speedway officials to sign a "Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement."[5]

3. The wheel and tire, traveling in a southerly or southeasterly direction, were propelled over the straight-away at the south edge of the track, and over the parked double row of racecars awaiting the next race.

4. Speedway manager Ronald Ellingson stated in his affidavit that seven concrete barricades, each approximately three feet high, served as a wall. This wall ran in "an east/west direction located approximately 100 feet south of the south edge of the racetrack." It served "to protect the pit people and drivers from any oncoming cars or anything that came off the track."

5. The release stated:

IN CONSIDERATION of being permitted to compete, officiate, observe, work for, or participate in any way in the EVENT(S) or being permitted to enter for any purpose any RESTRICTED AREA (defined as any area requiring special authorization, credentials or permission to enter or any area to which admission by the general public is rested or prohibited), EACH OF THE UNDERSIGNED, for himself, his personal representatives, heirs, and next of kin:

1. Acknowledges, agrees, and represents that he has or will immediately upon entering any of such RESTRICTED AREA, and will continuously thereafter, inspect the RESTRICTED AREAS which he enters and he further agrees and warrants that, if at any time, he is in or about RESTRICTED AREAS and he feels anything to be unsafe, he will immediately advise the officials of such and will leave the RESTRICTED and/or refuse to participate further in the EVENT(s).

2. HEREBY RELEASES, WAIVES, DISCHARGES, AND COVENANTS NOT TO SUE the promoters, participants, racing associations, sanctioning organizations or any subdivision thereof, track operators, track owners, officials, car owners, drivers, pit crews, rescue personnel, any persons in any RESTRICTED AREA, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the EVENT(s), premises and event inspectors, surveyors, underwriters, consultants and others who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENTS(s) and each of them, their directors, officers, agents and employees, all for the purposes herein referred to as "Releasees," FROM ALL LIABILITY, TO THE UNDERSIGNED, his personal representatives, assigns, heirs and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

3. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COST they have incur arising out of or related to the EVENTS WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

4. HEREBY ASSUMES FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEES or otherwise.

5. HEREBY acknowledges that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. Each of THE UNDERSIGNED also expressly acknowledges that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT RESCUE OPERATIONS OR PROCEDURES OF THE RELEASES.

6. HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING

All individuals wishing to enter the pit area were required to pay an entry fee and sign the release form. This document provided that the signees covenant not to sue the track owners, their insurers and others and release, waive, discharge them from all liability "for any and all loss or damage, and any claim or demands therefor on account of injury to the person or property or resulting in death of the undersigned arising out of or related to the events, whether caused by the negligence of the releasees or otherwise." This release was a condition to being allowed into any "restricted area," such as the pit, and applied to anyone competing, officiating, observing, working for, or participating in races at the speedway. The form defines restricted area as "any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited." At the bottom of the form are lines allowing for eighteen signatures. Printed on each signature line in bold capitalized letters, is "I HAVE READ THIS RELEASE." Holzer signed this document literally on top of these capitalized words. He had previously signed the same agreement on June 14, 1995 and July 29, 1995.

[¶ 6.] At the time of the accident, K & K, an underwriting agent for Transamerica Insurance Group, provided liability insurance coverage to Speedway. K & K had nothing to do with vehicle inspection. A Speedway official was responsible for inspecting racecars before each race for safety precautions.

[¶ 7.] On July 27, 1998, Holzer filed a complaint against Speedway and K & K in the Fourth Judicial Circuit, Lake County, South Dakota. The complaint alleged negligence and reckless disregard against Speedway for the life, safety and health of Holzer and negligent inspection and breach of duty to third parties against K & K. Both Speedway and K & K filed motions for summary judgment, which the trial court granted. Holzer now appeals raising several issues for our review, one of which is dispositive:

> Do genuine issues of material fact exist as to whether the waiver and release signed by Holzer was valid and enforceable, thus relieving Speedway and its insurer, K & K from liability.

## STANDARD OF REVIEW

[¶ 8.] Our standard of review for a circuit court's grant of a motion for summary judgment is well settled. As we recently stated in *Kimball Investment Land, Ltd. v. Chmela:*

> Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." SDCL 15-6-56(c). We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. *Bego v. Gordon,* 407 N.W.2d 801, 804 (S.D.1987). All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. *Morgan v. Baldwin,* 450 N.W.2d 783, 785 (S.D.1990). The burden is on the moving party to clearly show an absence of any genuine issue of

NEGLIGENT RESCUE OPERATIONS and is intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.
I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW. (emphasis original).

material fact and an entitlement to judgment as a matter of law. *Wilson v. Great N. Ry. Co.*, 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968).

2000 SD 6, ¶ 7, 604 N.W.2d 289, 292 (citing *Mattson v. Rachetto*, 1999 SD 51, ¶ 8, 591 N.W.2d 814, 816–17 (quoting *Shuck v. Perkins County*, 1998 SD 32, ¶ 6, 577 N.W.2d 584, 586)). "Summary judgment will be affirmed if there exists *any* basis which would support the trial court's ruling." *Wolff v. SD Game, Fish and Parks Dept.*, 1996 SD 23, ¶ 32, 544 N.W.2d 531, 537 (citing *St. Paul Fire & Marine Ins. v. Schilling*, 520 N.W.2d 884, 886 (S.D.1994)) (emphasis added).

### ANALYSIS AND DECISION

[¶ 9.] **Do genuine issues of material fact exist as to whether the release signed by Holzer was valid and enforceable, thus relieving Speedway and its insurer, K & K from liability.**

[¶ 10.] Holzer argues the release violates public policy and therefore is ineffective and unenforceable. He also contends granting the motion for summary judgment was improper because whether he knowingly and voluntarily signed the release is a question of fact for the jury. We disagree with both arguments.

[¶ 11.] *A. Public Policy*

[¶ 12.] A review of cases involving releases concerning recreational activity establishes two general trends: (1) anticipatory, pre-injury releases are much more likely to be deemed valid and enforceable when they are written on a separate document and not as part of separate written material and (2) the more inherently dangerous or risky the recreational activity, the more likely an anticipatory release will be held valid. *Johnson v. Rapid City Softball Ass'n.*, 514 N.W.2d 693, 700 (S.D. 1994) (Wuest, J. concurring in result and concurring specially).

[¶ 13.] The document signed by Holzer was a separate document. As will be more fully developed, this concern is connected with claims of knowledge and voluntariness.

[¶ 14.] Since the time of the ancients, records exist of racing on foot and by animal. The 20th Century has enlarged the scope of racing competition to that of motor vehicles. The dangerousness of racing numerous automobiles at the fastest possible speeds is obvious. In such an instance, there is no such thing as an inherently safe auto race. The closer one is to the action the greater the risk of injury or death. Holzer's duties placed him at the edge of the track, close to the racing action.

[¶ 15.] We have recognized that releases such as the form Holzer signed are typical of those used in the racing industry. *See Lee v. Beauchene*, 337 N.W.2d 827, 828 (S.D.1983) (citing *Andrea G. Nadel, Annotation, Liability for Injury or Death of Participant in Automobile or Horse Race at Public Track*, 13 A.L.R.4th 623 (1982) [hereinafter *Nadel*] ); *see also Randy J. Sutton, Annotation, Validity, Construction, and Effect of Agreement Exempting Operator of Amusement Facility from Liability for Personal Injury or Death of Patron*, 54 A.L.R. 5th 513 (1998)[hereinafter *Sutton*]. In *Lee*, the plaintiff stock car driver sustained injuries when his car struck a hole in the track and flipped, leaving him paralyzed from the waist down. Upon entering the racetrack before the accident, Lee was required to sign a release agreement. In affirming the circuit court's grant of summary judgment to the defendant speedway, we stated absent "a legislative directive, these releases have withstood attacks that they are contrary to public policy." *Lee*, 337 N.W.2d at 828 (citing *Tope v. Waterford Hills Road Racing Corp.*, 81 Mich.App. 591, 265 N.W.2d 761 (1978)). In South Dakota no such legislative directive exits.[6]

6. Public policy as established by the legislature would seem to be moving in a direction

[¶ 16.] However, releases that are construed to cover willful negligence or intentional torts are not valid and are against public policy. *Id.* (citing *Winterstein v. Wilcom,* 16 Md.App. 130, 293 A.2d 821 (1972); SDCL 53–9–3). "Willful and wanton misconduct is something more than ordinary negligence but less than deliberate or intentional conduct." *Id.* at 829 (citing *Granflaten v. Rohde,* 66 S.D. 335, 283 N.W. 153 (1938)). Holzer alleged in his complaint that Speedway acted "negligently and with reckless disregard toward his life, safety, and health" by failing "to provide adequate protection from the racetrack for the individuals in the pits, they failed to warn individuals in the pits of the potential dangers, and they located the pits in an unsafe, unprotected and unsecured area."

[¶ 17.] "Conduct is gross, willful, wanton, or reckless when a person acts or fails to act, with a conscious realization that injury is a *probable,* as distinguished from a *possible* (ordinary negligence), result of such conduct." *Id.* (citing *VerBouwens v. Hamm Wood Products,* 334 N.W.2d 874, 876 (S.D.1983) (emphasis in original)). The Restatement (Second) of Torts § 500 (1965) defines the recklessness standard as:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable [person] to realize not only that his conduct creates an unreasonable risk of physical harm to another, but also such risk is substantially greater than that which is necessary to make his conduct negligent.

*Kellar v. Lloyd,* 180 Wis.2d 162, 509 N.W.2d 87, 95 (Ct.App.1993). Thus, for Holzer to prevail under a theory of "reck-

lessness," and to place Speedway's conduct outside the coverage of the release, a question of fact must exist that Speedway acted with a "conscious disregard of an unreasonable and substantial risk of serious bodily harm to another." *Id.*

[¶ 18.] Although Holzer raises this legal claim, the record does not contain any supporting facts showing Speedway recklessly or consciously disregarded any risk of harm to him. Seven concrete barricades, each approximately three feet high, served as a protective wall "to protect the pit people and drivers from any oncoming cars or anything that came off the track."

[¶ 19.] Holzer also alleges that because the pit area in use on the night of his accident was not the interior pit area, a genuine issue of material fact exists as to whether it contributed to his accident. However, Ellingson stated in his affidavit "[t]hat evening and throughout the last 3 years, we've been pitting on the outside of the racetrack." Thus, Speedway had already been using that pit area regularly, and there is no evidence in the record indicating any accidents had occurred in those three years because of its location of the pit area. There is nothing in the record to create a question of fact that Speedway knew or had reason to know of an unreasonable risk of harm to Holzer or other pit workers because of the location of the pit area. *See Huber v. Hovey,* 501 N.W.2d 53 (Iowa 1993) (summary judgment affirmed in favor of raceway based upon a release where a person standing in a pit area was struck by a wheel and axle that had become detached from a car participating in a race); *Kellar,* 509 N.W.2d at 96 (stating plaintiff failed to allege defendants knew or had reason to know of an unreasonable risk of harm to her or flagging workers because of the design of the

of providing limited liability for inherently dangerous sporting events. *See* SDCL ch. 42–11 providing limited immunity for engaging in equine activity. *See also Vilhauer v. Horse-* *men's Sports Inc.,* 1999 SD 93, 598 N.W.2d 525 and *Nielson v. AT & T Corp.,* 1999 SD 99, 597 N.W.2d 434.

structure at her station on the racetrack where she was injured).

[¶ 20.] Nor has Holzer alleged Speedway knew or had reason to know of any defects in the race car from which the wheel and tire broke loose. *See id.* The circuit court was correct when it stated in its letter opinion, "[u]pon searching the file I can find no willful, wanton or intentional conduct which would place an issue of fact in question taking it out of the release area." [7] *See Lee*, 337 N.W.2d at 829.

[¶ 21.] The complained of conduct and the type of accident that occurred are clearly contemplated by, and within the scope of the release. Holzer has failed to provide any evidentiary support for a claim of willful or reckless acts that would place Speedway's conduct outside the coverage of the release.

[¶ 22.] Holzer also argues the release violates public policy because it involves a public interest in recreation. We do not agree. Besides South Dakota, releases by participants in automobile races have been upheld and found not to violate any public policy in a number of jurisdictions. *See Nadel, supra* at 635 (citing cases); *Gore v. Tri–County Raceway, Inc.,* 407 F.Supp. 489, 492 (M.D.Ala.1974) (citing *Doster v. C.V. Nalley, Inc.,* 95 Ga.App. 862, 99 S.E.2d 432 (1957); *Seymour v. New Bremen Speedway, Inc.,* 31 Ohio App.2d 141, 287 N.E.2d 111 (1971); *Theroux v. Kedenburg Racing Assn.,* 50 Misc.2d 97, 269 N.Y.S.2d 789; *Lee v. Allied Sports Associates,* 349 Mass. 544, 209 N.E.2d 329 (1965); *Corpus Christi Speedway v. Morton,* 279 S.W.2d 903 (Tex.Civ.App.1955)).

[¶ 23.] Some courts have found exculpatory releases violate public policy when they involve a matter of interest to the public at large or the state. *Seaton v. East Windsor Speedway, Inc.,* 400 Pa.Super. 134, 582 A.2d 1380, 1382 (1990). However, the public interest in recreation typically involves a facility providing an essential or public service. *See Sutton, supra* at 528. Other matters of interest to the public or state include "the employer-employee relationship, public service, public utilities, common carriers, and hospitals." *Seaton,* 582 A.2d at 1382 (citing *Leidy v. Deseret Enterprises, Inc.,* 252 Pa.Super. 162, 381 A.2d 164, 167 (1977)).

[¶ 24.] The release Holzer signed in this case does not involve a matter of public interest, but rather, a private agreement between individuals. Such a release has very little, if any, negative impact on the general population. *See Grbac v. Reading Fair Co., Inc.,* 521 F.Supp. 1351, 1355 (W.D.Pa.1981) (concluding "a release in an agreement concerning participation in an automobile race does not contravene any policy of the law."). "We are dealing with a fairly narrow segment of the public participating in a relatively dangerous sporting activity. The general public as a whole is minimally affected." *Tope,* 265 N.W.2d at 764. Nor does this case involve a utility or other quasi-public entity that supplies essential services. *Id.* at 765.

[¶ 25.] Holzer participated in Speedway automobile races as a form of recreation—his livelihood did not depend on working as a member of a pit crew, as he served as a

---

7. Because of our resolution of this issue, we do not reach the issue of whether the accident was foreseeable. However, we do note that evidence in the record indicates the accident could not have been prevented. Nordstrom stated in his affidavit that there would have been nothing to look for or see during an inspection of the vehicle. There also could have been no advance warning of this type of break to a wheel axle. In fact, Holzer concedes in his appellate brief "[b]ecause of the nature of the accident, it cannot be said that Mr. Holzer could have realistically contemplated its occurrence." He also states, "[i]t seems that, in fact, the manner in which the tire left the vehicle was not only a 'freak' accident, but occurred at a place in the racetrack where it was extremely unlikely." Holzer further states, "[t]here is no doubt that this 'freak' accident could not have been contemplated by either one of the parties." It is apparent from the record that Speedway performed safety inspections of the racecars before each race. There is no showing how this conduct could be characterized as "reckless" or "willful."

nonpaid volunteer for the Bortnem racing team. *Grbac,* 521 F.Supp. at 1355. Thus, Holzer was not compelled in any way to enter the Speedway pit area. *See Gervasi v. Holland Raceway, Inc.,* 40 A.D.2d 574, 334 N.Y.S.2d 527, 529 (N.Y.App.Div.1972) (rejecting the argument that a release was unenforceable as violative of public policy when racing mechanics were not employees of the defendant racetrack, and they could have refused to participate in the race or to sign the release); *Gore,* 407 F.Supp. at 492 (noting that "participation in automobile races and other sporting events is a voluntary undertaking."). If Holzer's recreational enjoyment was achieved from viewing a race, he could have entered the grandstands as a spectator and would not have been subject to the release he signed to become a member of a pit crew.

[¶ 26.] There is no public policy in this state against race promoters being afforded some contractual protection for sponsoring automobile racing, an inherently dangerous sport. *Lee,* 337 N.W.2d at 828. We agree with the court in *Grbac,* when it stated: "fewer promoters would be willing to hold automobile races if courts refused to permit them to limit their exposure to liability for racetrack accidents, in what is undeniably a dangerous sport." 521 F.Supp. at 1355; *see also Gore,* 407 F.Supp. at 492 (stating "[i]f these agreements, ... were not upheld, the effect would be to increase the liability of those organizing or sponsoring such events to such an extent that no one would be willing to undertake to·sponsor [them].""). We find the release in this case does not violate public policy.

[¶ 27.] **B. Knowledge and Voluntariness.**

[¶ 28.] Holzer also contends that whether he knowingly and voluntarily signed the release is a question of fact for the jury. "To be valid, a release must be fairly and knowingly made." *Johnson,* 514 N.W.2d at 697 (citing *Paterek v. 6600 Ltd.,* 186 Mich.App. 445, 465 N.W.2d 342, 344 (1990)). However, we commence analysis of this claim mindful of our holding that "one who accepts a contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation or other wrongful act by another contracting party." *LPN Trust v. Farrar,* 1996 SD 97, ¶ 13, 552 N.W.2d 796, 799 (citing *Flynn v. Lockhart,* 526 N.W.2d 743, 746 (S.D.1995) (quoting 17A Am. Jur.2d *Contracts* § 224 (1991))).

[¶ 29.] Holzer claims he was given no "meaningful opportunity to read the agreement before signing [it]." He relies heavily on *Eder v. Lake Geneva Raceway,* 187 Wis.2d 596, 523 N.W.2d 429 (Ct.App. 1994) for this contention. *Eder* involved two spectators who, after being required to sign a release and waiver of liability before entering a raceway, were injured when a motorbike left the racetrack and struck each of them. 523 N.W.2d at 430–31. The court reversed the circuit court's grant of summary judgment in favor of the raceway.

[¶ 30.] The circumstances and facts involved in *Eder* are distinguishable from the case before us. First, *Eder* involved two ·spectators, who were observing the races from the grandstand when they were injured. In this case, Holzer was actually participating in the races as a pit crew member. Second, the plaintiff in *Eder* was stopped in the parking lot before entering the track while she was still in her vehicle, with other spectators waiting behind her. *Id.* at 430. The court stated "[w]e cannot believe Raceway intended that entrants would hold up the progression of cars into the racetrack in order to read the release." *Id.* at 432. Finally, the injured spectators had never been to the racetrack before the accident. The court concluded "[s]ignificant familiarity with the dangers involved plus knowledge of the terms of the release are necessary conditions precedent" to enforce the release. *Id.* at 433.

[¶ 31.] Holzer relies on the affidavit of Jay Sanner, a regular pit crew worker at the Speedway. Sanner stated in his affi-

davit that upon entrance to the pit area, pit workers were required to sign a waiver form and "that there are several people waiting to gain entrance to the pit area at the same time. The only thing on Affiant's mind at the time of entering the gate is racing and therefore no attempt is made to read the aforementioned waiver form." However, there is no evidence in the record that Holzer was denied the opportunity to step out of any line that may have existed and read the release had he so desired. There is no evidence in the record that he was forced to sign it. While "several people" may have been waiting at the same time to enter the pit area, there is no evidence pit workers were denied the opportunity to read the release or ask questions about it. *See Lee,* 209 N.E.2d at 332 (stating "[a]lthough the line of people at the table on which the release sheets were located was 'rolling along,' there was no evidence that Lee was denied the opportunity to read the release had he so desired.").

[¶ 32.] *1. Misrepresentation*

 [¶ 33.] This Court has held "[a] release is not fairly made and is invalid if the nature of the instrument was misrepresented or there was other fraudulent or overreaching conduct." *Johnson,* 514 N.W.2d at 697 (citing *Paterek,* 465 N.W.2d at 344); *see also LPN Trust,* 1996 SD 97, ¶ 13, 552 N.W.2d at 799. Other courts also look for evidence of fraud or breach of trust:

> In the absence of fraud or a relation of trust and confidence between the parties, a releasor can ordinarily not avoid the effect of a release upon the ground that at the time he signed the paper he did not read it or know its contents, but relied on what another said about it.

*Seaton,* 582 A.2d at 1383 (citing 66 Am. Jur.2d *Release* § 15 (1973); *Ackler v. Raymark Indus., Inc.,* 380 Pa.Super. 183, 190, 551 A.2d 291, 294–95 (1988); *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563 (1983)). "The question whether there is fraud in obtaining a release is generally one of fact." *Lee,* 209 N.E.2d at 333 (citing *Barrett v. Conragan,* 302 Mass. 33, 35, 18 N.E.2d 369). Here, however, there are no facts indicating Speedway made any representations to him, let alone false representations as to what he was signing. There is also no evidence and no contention that the printing on the release sheet was covered or otherwise concealed from Holzer. *Id.* at 332; *see also Seaton,* 582 A.2d at 1383 (finding plaintiff did not make an allegation that the release he signed was folded or otherwise hidden so as to constitute fraud).

[¶ 34.] This is also not a case where Holzer was told he was signing a roster or some other document instead of a release. *Compare Johnson,* 514 N.W.2d at 698 (noting Johnson was told she needed to sign a team roster before she could play on the softball team, when the document was actually a release). Nor was the disclaimer of liability language hidden inconspicuously in the release. *See Baker v. City of Seattle,* 79 Wash.2d 198, 484 P.2d 405, 406–07 (1971) (holding release invalid when disclaimer was buried in the middle of the agreement and was not conspicuous). The release presented to Holzer contained its critical language in block capital letters in bold print. "In the absence of any concealment of or false representations as to the contents of the release it could be ruled as [a] matter of law that the release was not procured by fraud." *Lee,* 209 N.E.2d at 333. Although it is unfortunate Holzer is not able to explain his intent in signing the release, we have not discovered any evidence in the record indicating he was misled, coerced or forced into signing the form.

[¶ 35.] *2. Comprehension*

 [¶ 36.] Paul Holzer states in his affidavit that Holzer "was of lower intelligence and [Paul was] unsure whether [Holzer] could even read the release or underst[and] the implications of what he was signing." Paul Holzer further states in his affidavit:

Vernon was a poor student. His reading comprehension was very low. The highest grade he attained in English or Literature was a D+ as a ninth grader.... Vernon was passed through school, although I do not believe he should have been. He graduated 105th in a class of 110. He had 14 days of absences as a senior ... I always took care to read things to him and explain the writing to insure that he understood what he read, as his comprehension was poor.

[¶ 37.] Initially, we must note the language of the release signed by Holzer is unambiguous. "Whether the language of a contract is ambiguous is ordinarily a question of law." *Enchanted World Doll Museum v. Buskohl,* 398 N.W.2d 149, 151 (S.D.1986) (citing *Jensen v. Pure Plant Food International, Ltd.,* 274 N.W.2d 261, 264 (S.D.1979)). The language in a contract may be said to be ambiguous when "it is reasonably capable of being understood in more than one sense." *Id.* (citing *Ponderosa–Nevada, Inc. v. Venners,* 90 S.D. 579, 243 N.W.2d 801 (1976); *Jones v. American Oil Co.,* 87 S.D. 384, 387, 209 N.W.2d 1, 3 (1973)).

[¶ 38.] In *Johnson,* this Court in ruling a genuine issue of material fact existed as to whether Johnson was aware she was signing a release, recognized "the release did not contain a plain and clear statement *directly before the signature lines.*" 514 N.W.2d at 698. In the case before us, the release *did* contain a clear and unambiguous statement immediately before the signature line. The statement provides:

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW. (capitalization in original).

In addition to this statement, printed on each signature line in bold capitalized letters, is "I HAVE READ THIS RELEASE." Holzer signed his name directly on top of these words.

[¶ 39.] This release is not ambiguous. It is direct, simple and cannot be "understood in more than one sense." To hold a reasonable person would not realize the significance of the release signed by Holzer would be to ignore the unambiguous text of the document. *Haines v. St. Charles Speedway, Inc.,* 874 F.2d 572, 575 (8th Cir.1989); *see also Provence v. Doolin,* 91 Ill.App.3d 271, 46 Ill.Dec. 733, 414 N.E.2d 786, 794 (1980) (ruling the form and language of an agreement stating "WAIVER AND RELEASE FROM LIABILITY AND INDEMNITY AGREEMENT," "is so conspicuous that reasonable men could not reach different conclusions on the import and significance of the instrument where a person knowingly and willingly signed the document."). "To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts." *LPN Trust,* 1996 SD 97, ¶ 13, 552 N.W.2d at 799 (citing 17A Am.Jur.2d *Contracts* §§ 224–228 (1991)); *Huber,* 501 N.W.2d at 55. In *Johnson* we cited with approval *Dombrowski v. City of Omer,* 199 Mich.App. 705, 502 N.W.2d 707 (1993), which also involved the issue of a signed waiver of liability for participation in a sporting event. *Dombrowski* held that "one who signs a contract cannot seek to invalidate it on the basis that he or she did not read it ... absent a showing of fraud or mutual mistake." 502 N.W.2d at 710.

[¶ 40.] Having fully considered the circumstances surrounding the execution of the release, we conclude Holzer's argument must fail that genuine issues of material fact exist as to his ability to comprehend the terms of the agreement. In *Haines*, the court upheld the validity of a release signed by a race car driver after he was injured. The court considered Haines' claim that he possessed only a second or third grade reading ability, and concluded "[i]f Norman Haines is functionally illiterate, it was his duty to procure someone to read or explain the release to him before signing it." *Haines*, 874 F.2d at 575.

[¶ 41.] Similarly, in this case, although Holzer was legally competent, and possessed a high school diploma, if Holzer's father typically had to explain writings to him to "insure that he understood what he read," then Holzer should have either requested someone to explain the release to him before signing it, or simply refused to sign. There are three unambiguous releases in the record, two from before the accident and the one in question, all with Holzer's signature.

[¶ 42.] There can be no valid legal or factual argument disputing whether he voluntarily, and knowingly chose to sign the agreement. While we are sensitive to the circumstances now facing Holzer, he "doubtlessly knew that the sport placed risks on both participants and spectators." *Id.* He had worked as a volunteer pit crew member on at least two other occasions prior to his accident. Ellingson stated in his affidavit that although Holzer was "relatively a new man in the racing circuit," Holzer had been "looking at buying somebody's [race] car" and "was deeply getting interested in racing."

[¶ 43.] Automobile racing is not an individual sport. It involves numerous drivers, support staff, pit crews and is financially supported by the attendance of a substantial number of paying spectators. It is not reasonable, nor realistic to require that management individually test each participant and spectator as to their knowledge of a race car's characteristics during a race and their knowledge of the legal effect of a waiver of liability. "Just as the drivers were not deterred from participating by the danger of being injured in a crash, the pit crew members who chose to station themselves near the track to give signals accepted the obvious risk of being struck by a car." *Provence*, 46 Ill.Dec. 733, 414 N.E.2d at 794.

[¶ 44.] Speedway has established there are no genuine issues of material fact concerning the release and we hold that Speedway was entitled to judgment as a matter of law. The unambiguous release Holzer signed effectively released Speedway from liability as a matter of law. Based upon the same document and rationale it also released K & K Insurance Group as Speedway's underwriter/insurer. (*Compare Huber*, 501 N.W.2d at 58, where K & K was not specifically released as the underwriter/insurer for the track's owner and operator). Affirmed.

[¶ 45.] AMUNDSON and KONENKAMP, Justices, concur.

[¶ 46.] SABERS, Justice, concurs in result.

[¶ 47.] MILLER, Chief Justice, concurs in part and dissents in part.

SABERS, Justice (concurring in result).

[¶ 48.] I would agree with Chief Justice Miller's writing if this were the first such RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT form that Vernon signed. Unfortunately for him, the fact is that this was the third RELEASE AND WAIVER OF LIABILITY form that Vernon signed.

MILLER, Chief Justice (concurring in part and dissenting in part)

[¶ 49.] I generally agree that *requiring car race participants to sign a release of liability is not violative of public policy.*

However, it was improper to grant summary judgment on the issue of Holzer's knowledge or voluntariness, because genuine issues of material fact were presented to the court.

[¶ 50.] Initially, it must be noted that summary judgment is usually not suitable in actions involving state of mind. *Wilson v. Great N. Ry. Co.*, 83 S.D. 207, 212, 157 N.W.2d 19, 22 (1968). *See also, Ahl v. Arnio*, 388 N.W.2d 532, 534 (S.D.1986). "[S]urmise that a party will not prevail upon trial is not sufficient basis to grant [summary judgment] on issues which are not shown to be sham, frivolous or so unsubstantial that it is obvious it would be futile to try them." *Wilson*, 83 S.D. at 212, 157 N.W.2d at 21; *see also, Ahl*, 388 N.W.2d at 533. On appeal, we are not to decide the issue of fact, only whether one exists. *Wilson*, 83 S.D. at 211, 157 N.W.2d at 21.

[¶ 51.] The record contains several items that raise a legitimate factual issue whether Holzer knowingly or willingly signed the waiver. First, the waiver form itself, which is attached to this writing, is confusing and misleading. At the bottom half of the roster-like form there are 18 lines containing the same number of signatures. Each signer is asked to print his name, sign his name over a provision that states, "I have read this release,"and list his duties. Holzer's printed name, signature, and "# 2" appear on the second line of the waiver, followed by sixteen other signatures.

[¶ 52.] Next, the record contains the affidavit of Jay Sanner, who has attended many automobile races, including races at Lake County Speedway, and has entered and worked in the pit area for various race car drivers. Based on his familiarity with the process utilized to gain entrance to the pit area of Lake County Speedway, he testified that, "upon entrance to the gate, a waiver form is handed to the individual entering the pit, they are told to print and sign in, and then pay their entry fee." In addition, "there are several people waiting to gain entrance to the pit area at the same time. The only thing on [Sanner's] mind at the time of entering the gate is racing and therefore no attempt is made to read the aforementioned waiver form. To the best of [Sanner's] knowledge, this is the only way into the pit area before entering a race."

[¶ 53.] The waiver form and Sanner's affidavit, together with common knowledge, could well lead a factfinder to conclude that Holzer unknowingly or involuntarily signed the waiver form as part of the pressure-filled routine of gaining access to the pit area. These pieces of evidence show that Holzer was among a steady stream of people waiting to enter the pit area that night.

[¶ 54.] As Sanner's affidavit points out, the important ramifications of signing the waiver were not discussed or even mentioned to those participants waiting in line to enter. Instead, they were all handed the roster-like form, told to print and sign their name, and then required to pay a fee. In this situation, the last thing on the mind of these entrants was understanding their legal rights. Rather, they were focused on getting into the pit area to prepare for the race. Surely, when faced with the choice of blindly signing the roster-form and proceeding on into the pit area, or not signing and jeopardizing the qualification of his team to race, a participant would opt for the former.

[¶ 55.] Moreover, the format of the waiver form clearly served to de-emphasize its important legal effect. Indeed, it could be more likened to a petition or a roster (forms that do not require an individual to pause and appreciate the consequences of signing such a document) than a legally binding release of liability. With its small print, single-spaced paragraphs, and blank lines for numerous signatures at the bottom, a reader could easily confuse the form with a document of insignificant legal ramifications, especially when it was presented without explanation. It would have been a

more meaningful and appropriate process had each person been given an individual release and waiver.

[¶ 56.] That none of the participants appreciated the significance of what they were signing is evident from the waiver form itself. Where it directed participants to list their "duties," everyone, including Holzer, merely listed numbers, which presumably referred to the number of the car on whose team they worked. Such a vague response supports the contention that either the form was confusing or the signers were hurried into signing it, or both.

[¶ 57.] Any spectator at this type of event has certainly seen the parade of vehicles pulling race cars on trailers waiting to enter the pit area prior to the race. The format of the waiver form, together with the circumstances under which participants such as Holzer were required to sign, create a question about how knowing or voluntary such a release of liability could have been. Like the line of spectators waiting to get into the race in *Eder v. Lake Geneva Raceway, Inc.*, 187 Wis.2d 596, 523 N.W.2d 429 (Ct.App.1994), there was no meaningful opportunity for Holzer to read the agreement before signing. "We cannot believe [Speedway] intended that entrants would hold up the progression of cars into the racetrack in order to read the release." *Id.* at 432. In this situation, Holzer's signature would not have been entirely voluntary; at least a fact question for a jury is present.

[¶ 58.] Further compounding the hurried, pressure-filled situation facing Holzer was the fact that he might not have had the ability to read or comprehend the waiver form. The record contains an affidavit from Paul Holzer to this effect, stating that "Vernon was a very poor student.... His reading comprehension was very low." The form, which contains an abundance of legal terms, was seemingly a boilerplate document drafted by lawyers. *See, e.g.*, *Eder*, 523 N.W.2d at 433 n.6; *Haines v. Saint Charles Speedway, Inc.*,

874 F.2d 572, 574 (8thCir.1989) (providing examples of similar waiver forms). To a person with limited reading function, the form could have just as well been one of Plato's dialogues, with legalese such as "indemnity," "in consideration of," "covenants not to sue," and "hold harmless" in bold capital letters. Holzer's poor reading ability, combined with the large crowd of participants waiting to gain access to the pit area behind him, surely could have created a situation where he signed the waiver form just to keep the flow of people going. At the very least, it creates a genuine issue of material fact.

[¶ 59.] The majority states that "there is no evidence in the record that Holzer was denied the opportunity to step out of any line that may have existed and read the release had he so desired." So what? Neither does it show that Speedway offered to let him step aside and read it. The majority opinion further concludes that "[t]here is no evidence in the record that he was forced to sign it." Such a conclusion is out of touch with the realities of the situation. For reasons noted above, this is clearly not the same scenario as that presented in *Haines*, where the court opined that if the plaintiff was functionally illiterate, it was his duty to have someone read the release to him before signing it. 874 F.2d at 575.

[¶ 60.] Under our summary judgment standard of review, we are bound to independently review the record for any genuine issue of material fact, in a light most favorable to Holzer, the non-moving party. *Fritz v. Howard Township*, 1997 SD 122, ¶ 8, 570 N.W.2d 240, 241. We are not to decide whether such facts have merit, as the majority has done. "The question presented by a motion for summary judgment is whether or not there is a genuine issue of material fact. 'It does not contemplate that the court shall decide such issue of fact, but shall determine only whether one exists.'" *Piner v. Jensen*, 519 N.W.2d 337, 340 (S.D.1994) (quoting *Wilson*, 83 S.D. at 211, 157 N.W.2d at 21).

[¶ 61.] Guided by this standard of review, I find a genuine issue of material fact exists as to Holzer's knowledge or intent in signing the waiver. It should now be left to the factfinder to decide the merits of the claim. As Justice Sabers has appropriately observed: "The Constitution guarantees the right to a jury trial—the trial court denied it. The Constitution guarantees that courts shall remain open—the trial court closed it." *Reeves v. Reiman,* 523 N.W.2d 78, 87 (S.D.1994) (Sabers, J., concurring in result in part and dissenting in part). That principle clearly applies here. I would reverse.

## RELEASE AND WAIVER OF LIABILITY,
## ASSUMPTION OF RISK AND INDEMNITY AGREEMENT

Stock Lake County Speedway

DESCRIPTION AND LOCATION OF SCHEDULED EVENT(S)

8/5/95

DATE RELEASE SIGNED

IN CONSIDERATION of being permitted to compete, officiate, observe, work for, or participate in any way in the EVENT(S) or being permitted to enter for any purpose any RESTRICTED AREA (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited), EACH OF THE UNDERSIGNED, for himself, his personal representatives, heirs, and next of kin:

1. Acknowledges, agrees, and represents that he has or will immediately upon entering any of such RESTRICTED AREAS, and will continuously thereafter, inspect the RESTRICTED AREAS which he enters and he further agrees and warrants that, if at any time, he is in or about RESTRICTED AREAS and he feels anything to be unsafe, he will immediately advise the officials of such and will leave the RESTRICTED AREAS and/or refuse to participate further in the EVENT(s).

2. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoters, participants, racing associations, sanctioning organizations or any subdivision thereof, track operators, track owners, officials, car owners, drivers, pit crews, rescue personnel, any persons in any RESTRICTED AREA, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the EVENT(S), premises and event inspectors, surveyors, underwriters, consultants and others who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENT(S) and each of them, their directors, officers, agents and employees, all for the purposes herein referred to as "Releasees," FROM ALL LIABILITY, TO THE UNDERSIGNED, his personal representatives, assigns, heirs, and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

3. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COST they may incur arising out of or related to the EVENT(S) WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

4. HEREBY ASSUMES FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEES or otherwise.

5. HEREBY acknowledges that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. Each of THE UNDERSIGNED also expressly acknowledges that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT RESCUE OPERATIONS OR PROCEDURES OF THE RELEASEES.

6. HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING NEGILGENT RESCUE OPERATIONS and is intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW.

### ALL SECTION MUST BE COMPLETED.

| PASS # | PRINT NAME HERE | SIGN NAME HERE | DUTIES |
|---|---|---|---|
| | John Neill | Jr. Neill | 13 |
| | Vernon Hilzer | Vernon Hilzer | 13 |
| | Cheryl Vincent | Cheryl Vincent | 13 |
| | | | 42 |
| | Kurt Hawkins | Kurt Hawkins | 4 B |
| | Wesley Corwin | Wesley C. | 2 |
| | Brian Wolfman | B. Wolf | 9 |
| | Tom Rossillan | | 98 |
| | Rob Robenberg | Rob Robenberg | 66 |
| | Jerry Gullinardon | | #46 |
| | Karen Floren | Karen Floren | #46 |
| | Butch Floren | Butch Floren | #46 |
| | | | |
| | Lynn Tinaba | | 46 |
| | Dan Stevenson | | 56 |
| | Jeff Dyce | Jeff Dyce | 51 |
| | Buck Mills | Buck Mills | |

SIGNATURE AND TITLE OF WITNESS

Exhibit __A__

ADDRESS OF WITNESS

CL 29

3-92