KONENKAMP, Justice
(dissenting).
[¶ 42.] During the oral argument in this appeal, one of the lawyers asserted that the same rules courts apply to commercial contracts should also apply to marital agreements. Today, the Court embraces this bleak and mercantile view of marriage. Indeed, to support its decision on voluntariness, the Court cites all commercial cases as authority. It is true that courts have often said that marriages are contractual in nature, but the many complementary rights, duties, and remedies of married couples are also governed by statute and precedent, wholly apart from the general rules of contract. We have held, again and again, that the state of marriage is one of mutual confidence and trust. In this Court’s stark analysis, however, our authorities confirming marriage as a protected institution of undisputed social value barely receive consideration.
[¶ 43.] Relationships between husbands and wives cannot be likened unto commercial transactions among operatives who deal at arms length. See In re Estate of Gab, 364 N.W.2d 924, 925 (S.D.1985); Keith v. Keith, 37 S.D. 132, 156 N.W. 910, 911 (1916). Indeed, numerous courts have described the marital relationship as fiduciary. See Smith v. Smith, 124 Idaho 431, 860 P.2d 634, 643 (1993); Williams v. Waldman, 108 Nev. 466, 836 P.2d 614, 618 (1992); Sidden v. Mailman, 150 N.C.App. 373, 563 S.E.2d 55, 58 (N.C.Ct.App.2002); Tiryakian v. Tiryakian, 91 N.C.App. 128, 370 S.E.2d 852, 854 (N.C.Ct.App.1988); In re Estate of Lutz, 563 N.W.2d 90, 98 (N.D. 1997); Cohen v. Estate of Cohen, 23 Ohio St.3d 90, 491 N.E.2d 698, 699 (1986); Miller v. Ludeman, 150 S.W.3d 592, 597 (Tex. App.2004). We also have held that the relationship is fiduciary. Gab, 364 N.W.2d at 925 (confidential relationship). Until today, our law on marital agreements prohibited spouses in South Dakota from *15 treating “each other as strangers at arm’s length.” Id. at 926. As the North Dakota Supreme Court recognized, “Ordinarily, business transactions between a husband and wife will be deemed to be within the rule of confidential relations[.]” Barker v. Barker, 75 N.D. 253, 27 N.W.2d 576, 581 (1947).[15]
[¶44.] Here, the central question is whether Audrey Smid voluntarily signed a document in which she waived and renounced “any and all rights of homestead, surviving spouse award, surviving spouse right of election, exemption, family allowance, inheritance, descent, or other marital right arising by virtue of statute or otherwise” in her home. Under SDCL 29A-2-213(b)(1), a surviving spouse’s waiver is not enforceable unless it is executed voluntarily. The statute provides no definition of the word “voluntary.” It is left to us to define. We should consider the term in the light of South Dakota’s protective policy regarding marriage.[16] In that light, “voluntary” takes on a fuller meaning than the merely commercial one given by the Court.
[¶ 45.] By this Court’s reckoning, “voluntary” is relegated to nothing more than whether the spouse was “forced to sign the waiver.” This is the same primitive standard the circuit court used. Whether force was used may be the beginning of a voluntariness analysis, but it hardly disposes of the question. In accord with this standard, however, the Court quotes with approval a commercial contract principle: “ ‘one who accepts a contract is conclusively presumed to know its contents' and to assent to them, in the absence of fraud, misrepresentation or other wrongful act by another contracting party.’ ” See Holzer v. Dakota Speedway, Inc., 2000 SD 65, ¶ 28, 610 N.W.2d 787, 795 (citation omitted). The cases the Court offers to support its holding, Holzer, concerning an assumption of risk waiver signed by a racecar pit crew member, and LPN Trust v. Farrar Outdoor Adv. Inc., 1996 SD 97, ¶ 13, 552 N.W.2d 796, 799, a roadside billboard contract case, have nothing to do with marital relationships.
[¶ 46.] Regrettably, the Court’s decision puts us in the extreme minority who equate postnuptial agreements with business contracts. Most other courts take a far more insightful view of such agreements. In the case of In re Marriage of Bonds, for example, the court engaged in an extensive analysis distinguishing premarital agreements from commercial contracts. 24 Cal.4th 1, 99 Cal.Rptr.2d 252, 5 P.3d 815, 829 (2000), superseded by statute on different grounds, Li v. Tzortzatos, *16 2006 WL 3096066 (Cal.Ct.App.). In rejecting the idea that the two should be considered alike, the court observed: “considerations applicable in commercial contexts do not necessarily govern the determination whether a premarital agreement was entered into voluntarily.” Id. And, the court explained, “the reference to voluntariness in the Uniform [Premarital Agreement] Act was intended to convey an element of knowing waiver that is not a consistent feature of commercial contract enforcement.” Id. at 830 (emphasis added).[17]
[¶47.] Several, courts have examined the concept of voluntariness in the context of waivers in premarital and postnuptial agreements. From those cases, it is evident that several key elements are routinely considered. Those elements include: the bargaining power of the parties; whether there was coercion; the timing of the waiver and the impending event; the presence of independent counsel for the waiving party; and the party’s knowledge of the terms, purpose, and effect of the agreement.[18] Independent legal advice prevails as an important factor in most decisions.[19] Bonds, 99 Cal.Rptr.2d 252, 5 P.3d at 826-27; Lutz, 563 N.W.2d at 97-98; Kahn v. Kahn, 756 S.W.2d 685, 695 (Tenn. 1988); In re Marriage of Matson, 107 Wash.2d 479, 730 P.2d 668, 671 (1986); Button v. Button, 131 Wis.2d 84, 388 N.W.2d 546, 551 (Wis.1986).
[¶ 48.] Based on these authorities, and considering South Dakota’s strong support for the institution of marriage, on the question of voluntariness of the person against whom a postnuptial (marital) agreement is sought to be enforced, a court should examine:
1. Equality or inequality of bargaining power and sophistication between the parties;
*17 2. Proximity of the impending event (i.e., death, etc.) to the time of execution, with extremely short times closely scrutinized;
3. Advice of independent counsel at the time of signing the agreement, or express waiver of independent legal advice; and
4. If unrepresented, such person’s knowledge and understanding of the rights being given up, and an understanding of the true effect of the agreement.
These should be considered together, with no single element being dispositive. It would seem obvious, but still worth emphasizing, that as a matter of fundamental fairness, no spouse in South Dakota should forfeit his or her inheritance rights without these basic considerations. In light of these elements, let us now consider the facts of our case.
1. Inequality of Bargaining Power.
[¶ 49.] There is nothing in the record on whether Audrey possessed any legal or business sophistication. Nor is there any finding by the circuit court that “consideration” was given for the waiver. Nonetheless, this Court composes its own findings of fact, writing in its opinion that there was adequate “consideration” for Audrey’s waiver of rights.[20]
2. Proximity of Agreement Execution to Impending Event.
[¶ 50.] Here is one of the most troubling aspects of this case. It was obvious that Ronald’s death was imminent, and he had only decided, at the behest of his son, to proceed with an estate plan at the eleventh hour.[21] The timing could not have been more problematic. Audrey first saw and signed the trust agreement, as did her dying husband, on the afternoon of January 29, 2003. Ronald died early the next morning. With respect to Audrey, the agreement stated:
The settlor’s wife (Audrey Smid) by executing this Agreement and by executing and delivering the Warranty deed, on behalf of herself, her heirs, legal representatives and assigns, waives and renounces any and all rights of homestead, surviving spouse award, surviving spouse right of election, exemption, family allowance, inheritance, descent, or other marital right arising by virtue of statute or otherwise, in and to the real property.
She had little time to discuss it with anyone, much less to ponder the document as it might affect her. As will be more fully discussed below, no one explained the meaning of these legal terms to her. It is true that Audrey heard Ronald’s lawyer discuss the purpose for creating a trust agreement a few days earlier, on January 24. But nothing prepared her for this legal waiver language.
[¶ 51.] Again, it must be underscored that Audrey first saw the technical waiver language in the agreement when it was presented to her as Ronald was dying, twelve hours before he expired.[22] Yet, in *18 keeping with its commercial model for marital agreements, the Court affirms the circuit judge’s rationale that Audrey chose “not to consult with an attorney before signing” the agreement. Obviously, it would have been in her legal interests to have seen a lawyer, but to fault her for choosing to stay at her husband’s deathbed instead of leaving him to consult a lawyer imposes an unfair burden on Audrey. Ronald’s late decision put them in this position. It should not be held against Audrey that she chose dutifully to remain with her husband in his last moments.
3. Advice of Independent Counsel or Waiver of Counsel.
[¶ 52.] Presence of independent counsel is the best indicator that the disadvantaged party understood the effect of the agreement. See Lutz, 563 N.W.2d at 97-98. Although Attorney Wise never told Audrey that he was not her attorney, that he only represented Ronald, and that he could protect only Ronald’s interests, the circuit court found nonetheless that Audrey knew Wise was not representing her.[23] Yet the point cannot be overstated that Attorney Wise never advised her that she should seek her own legal counsel. In addition to no warning from Ronald’s attorney, no language in the agreement itself warned Audrey that she could or should seek legal advice. Nothing in the record establishes that Audrey knew what her options were as a wife, much less as an impending widow. Everything in those waning hours of Ronald’s life was oriented toward what Ronald wanted. As Attorney Wise explained, “Audrey’s claims were not my concern. My client’s wishes were my concern. And to the extent that she waived those rights, my client’s wishes were fulfilled.”
4. Understanding of Rights and Effect of Agreement.
[¶ 53.] This element comprises two separate questions: understanding the rights one has in forming an agreement, and understanding the practical effect of the agreement. Taking the second question first, the effect of the agreement, the facts as the circuit court found are fairly dispos-itive on this point. Audrey knew the purpose of the agreement was to transfer the home to Ronald’s children. She knew that she would be able to live in the home during her lifetime. Indeed, she wanted to help Ronald fulfill his intentions in this regard.
[¶ 54.] What she did not know, however, was what her legal rights were in the matter. Audrey was never told that Ronald’s interests could potentially conflict with hers. As the circuit court found, Attorney Wise “did not discuss with Audrey any of her statutory rights as surviving spouse.” The Court glosses over this point by declaring that Audrey knew she was waiving “certain” rights. But Audrey was never advised about the meaning of these “certain” rights, or how she could assert those rights. Even the circuit judge conceded, “There is no dispute that Audrey was never informed of her statutory rights as a surviving spouse.”
Conclusion
[¶ 55.] On the whole, these factors weigh against enforcing the agreement. The circuit court’s decision otherwise was *19 both clearly erroneous and legal error. Audrey had no legal advice and no warning that she should obtain legal advice. The document waiving her inheritance rights was placed before her only hours before her husband died. And at no time did anyone explain to her the legalistic waiver language that eliminated all her statutory rights.
[¶ 56.] It is not enough to declare, as this Court does, that considering her short-lived marriage and other circumstances, Audrey got what was coming to her. Our analysis cannot be controlled by the outcome. The rules we uphold today may well bind or loose many other marital arrangements. Those rules should be fairly and clearly delineated for the unique relationship marriage constitutes in our law. When husbands or wives wish to make distributions of marital assets, distributions that exclude their spouses, and especially deathbed distributions, the haste and anguish of the moment may deprive surviving spouses of an opportunity to preserve their rights. Today’s decision fails to recognize the critical interests at stake in protecting surviving spouses like Audrey in the difficult circumstances of making marital agreements on the eve of a pending death.

. The Court concludes that Audrey waived any claim that marriages are fiduciary relationships because she failed to raise the issue. Concededly, this is our standard policy: failure to argue a point waives it on appeal. There are limitations to this rule, however. The existence of a fiduciary relationship is a pure question of law. Ward v. Lange, 1996 SD 113, ¶ 12, 553 N.W.2d 246, 250. That marriage is a fiduciary relationship is beyond any dispute. To not take this into consideration risks a miscarriage of justice. See Childers and Davis, Federal Standards of Review § 6.03 (3d ed. 1999) (questions of law may be decided sua sponte especially if risk of miscarriage of justice).

. In addition to our more than century-long precedent, our code of laws also protects the institution of marriage. See, e.g., SDCL 25-7-1 (duty to support spouse); SDCL 20-9-7 (prohibiting abduction, enticement, or seduction of spouse); SDCL Title 29 (protection of spousal inheritance rights); SDCL 53-8-2(2) (agreement made on consideration of marriage); SDCL 43-3-4 (forbidding restraints on marriage); SDCL 36-33-29 (protecting marital confidentiality in therapy sessions); SDCL 25-8-57 (presumptive legitimacy of child born during marriage); SDCL 53-9-7 (voiding contracts in restraint of marriage); SDCL 19-13-12 (Rule 504(a)) (confidentiality of communication between husband and wife).

. Although this writing is limited to postnup-tial (marital) agreements under South Dakota's Uniform Probate Code, in keeping with most authorities, no distinction is made here between premarital and postnuptial (marital) agreements. None is made in our version of the Uniform Probate Code, SDCL Title 29A, and neither is one made in the Restatement (Third) of Property, Wills & Other Donative Transfers § 9.4, Premarital Or Marital Agreement. A distinction, however, not relevant here, is that some courts have held that parties to a prenuptial agreement, who, of course, are not yet married, are not presumed to share a confidential relationship.

. Bonds, 99 Cal.Rptr.2d 252, 5 P.3d at 826-27; McHugh v. McHugh, 181 Conn. 482, 436 A.2d 8, 11-12 (1980); In re Marriage of Spiegel, 553 N.W.2d 309, 315 (Iowa 1996); Tiryakian, 370 S.E.2d at 854; Lutz, 563 N.W.2d at 97-98; In re Marriage of Matson, 107 Wash.2d 479, 730 P.2d 668, 671 (1986); Button v. Button, 131 Wis.2d 84, 388 N.W.2d 546, 550-52 (Wis.1986).

. With respect to premarital agreements, the North Dakota Supreme Court summarized the state of the law in this country on the question of legal representation for the party against whom enforcement is sought.
No state makes independent counsel an absolute requirement for validity. Randolph v. Randolph, 937 S.W.2d 815, 822 (Tenn. 1996). Some states require at least an opportunity to consult with independent counsel, but do not require actual consultation. McKee-Johnson v. Johnson, 444 N.W.2d 259, 266 (Minn.1989)[, overruled by, In re Estate of Kinney, 733 N.W.2d 118 (Minn. 2007)]; Gant v. Gant, 174 W.Va. 740, 329 S.E.2d 106, 116 (W.Va. 1985). Many states, however, treat the absence or presence of independent legal counsel as a factual factor in assessing the voluntariness of a premarital agreement. Ex Parte Walters, 580 So.2d 1352, 1354 (Ala.1991); McHugh v. McHugh, 181 Conn. 482, 436 A.2d 8, 12 (1980); In re Benker’s Estate, 416 Mich. 681, 331 N.W.2d 193, 199-200 (Mich.1982); Fletcher v. Fletcher, 68 Ohio St.3d 464, 628 N.E.2d 1343, 1348 (Ohio, 1994); Randolph [v. Randolph], 937 S.W.2d[815,] 822; In re Marriage of Matson, 107 Wash.2d 479, 730 P.2d 668, 671 (1986); Button v. Button, 131 Wis.2d 84, 388 N.W.2d 546, 550-51 (1986)[J
Lutz, 563 N.W.2d at 97.

. It is distressing that the Court can, on the one hand, insist that Audrey “waived” the benefit of marriage as a fiduciary relationship, an undisputed principle of law, and, on the other hand, bolster the Trustee's position by entering appellate fact findings helpful to his case.

. Cf. Lutgert v. Lutgert, 338 So.2d 1111, 1113-16 (Fla.Ct.App.1976) (antenuptial agreement invalid — presented within twenty-four hours of wedding, with passage booked on European cruise).

.In the case of premarital agreements, some jurisdictions require grace periods before the agreements can be valid. See, e.g., 13 Dela Code 1974 § 301 (10-day waiting period).

. In this writing, no inquiry is directed at Attorney Wise. The issue is the enforceability of the postnuptial agreement, and not the extent of counsel’s duty to an unrepresented party to the agreement.