Frank GILBERT, d/b/a B & G Cattle on His Own Behalf and as Assignee of Corsica Livestock Marketing, Inc., Plaintiff and Appellant,

v.

UNITED NATIONAL BANK,
Defendant and Appellee,

and

Corsica Livestock Sales, Inc.; Ronald D. Wentland; George Etter; Elwood Nelson; General Service Corporation; Larry Refold; Ernest Marks; Stan Olson; Robert D. Joslyn, Sr.; General Management Corporation; First National Bank of Beresford, South Dakota; the Mitchell–Huron Production Credit Association; Hurley State Bank; Robert Verschoor; Donald Ensz; John Roth; Bernie Van Veuren; Robert Frederickson; Patrick Kirby and Mari Frederichs; Barnie Blauweit; Guy Varud and Varud Advertising, Defendants.

No. 16173.

Supreme Court of South Dakota.

Argued Nov. 28, 1988.

Decided Feb. 8, 1989.

Rick Johnson of Johnson, Eklund & Davis Gregory, for plaintiff and appellant.

Lawrence L. Piersol of Davenport, Evans, Hurwitz & Smith Sioux Falls, for defendant and appellee United Nat. Bank; Timothy M. Gebhart of Davenport, Evans, Hurwitz & Smith, Sioux Falls, on the brief.

SABERS, Justice.

Frank Gilbert (Gilbert), individually, and as assignee of other's claims, appeals from summary judgment in favor of United National Bank (UNB). For the reasons stated herein, we affirm.

### Facts

The following facts are developed from substantial deposition testimony:

In 1974, Gilbert, a long time cattle buyer, began purchasing cattle for Corsica Livestock Marketing, Inc. (CLM). Under the arrangement, Gilbert would purchase cattle with his own funds for delivery to CLM. In April 1979, Gilbert received several checks as payment for cattle he previously purchased and delivered to CLM. Four of these checks, totalling $311,630.21, were written on the General Services Corporation (GSC) account at the Sumitomo Bank in California (Sumitomo).[1] Previously, Gilbert was paid by checks drawn on CLM accounts in several South Dakota banks. He was told by CLM officials that the GSC account was a new checking arrangement. The checks written on the GSC account were subsequently dishonored. Apparently, the Sumitomo GSC account was depleted before Gilbert's checks arrived for collection. CLM's subsequent insolvency resulted in the closing of the livestock auction and proceedings in bankruptcy.

UNB's involvement in this action arose from activities which occurred earlier in March 1979. George Etter (Etter) and Don Ensz (Ensz), who were connected with CLM, met with UNB officials for the purpose of establishing two checking accounts at UNB. One account was established in the name of GSC. The other account was established in the names of GSC–CLM. A third person connected with CLM, Elwood Nelson (Nelson), was also involved in opening these accounts at UNB.

Corporate resolutions of authorization were prepared after the accounts were opened. The corporate resolution for the GSC account was signed by Nelson and authorized Nelson and Etter to draw on the account. The resolution for the GSC–CLM account was signed by Dale Dockendorf (Dockendorf), the President of CLM, and Etter. Dockendorf, Nelson, and Etter were authorized to draw on this account.

On March 20, 1979, Etter and Ensz sought to deposit a money order in the amount of $659,567.23 in the GSC account at UNB. The money order was drawn on a CLM account at Farmers State Bank in Parkston, South Dakota. It was not deposited because UNB refused Etter's and Ensz' request to wire transfer $500,000 to

---

1. Gilbert received two other checks which are part of this lawsuit, but not in issue on this appeal.

Sumitomo as the money order involved uncollected funds. Etter and Ensz requested that the money be transferred to Sumitomo as quickly as possible and UNB officials suggested that the money be wired from the Parkston bank to speed up the transaction. UNB received financial statements at this time from GSC and General Management Corporation (GMC), which was connected to GSC. These statements raised serious questions with UNB concerning the authenticity and veracity of the two corporations. Etter, Ensz, and Nelson also raised UNB's suspicions because of their attempts to pressure UNB to transfer the $500,000 to Sumitomo as quickly as possible.

On March 21, the Parkston bank wired $542,237.44 for deposit in the GSC–CLM account at UNB. Etter then called UNB to have $500,000 wired to Sumitomo. UNB wired the money to Sumitomo and made the decision to close the GSC and GSC–CLM accounts because of its suspicions. UNB closed the accounts and issued a cashier's check to GSC–CLM for the money remaining in the accounts. This check was received by Nelson.

During the following month, CLM delivered the Sumitomo checks to Gilbert, which were dishonored. Two years later, in 1981, Gilbert brought an action against CLM to recover the amount of these checks. He also alleged fraud against several individuals for the dissipation of CLM bank account funds. In 1982, Gilbert filed an amended complaint which included an action against UNB based on implied trust and negligence.

### A. *CLM's claims against UNB.*

Following Gilbert's amended complaint against UNB, CLM cross-claimed against UNB in 1982. CLM's cross-claim asserted two claims against UNB: 1) implied trust, and 2) failure to disclose fraudulent activity. CLM failed to serve the cross-claim on UNB and failed to take any action on it.

Sometime prior to February 1, 1986, Gilbert agreed with CLM to dismiss his action against CLM in exchange for an assignment of CLM's cross-claim against UNB. On February 1, Gilbert moved to amend his complaint to include the claims asserted by CLM in its cross-claim. On February 26, UNB moved for summary judgment or dismissal of CLM's cross-claim. UNB alleged in its motion that CLM failed to state a claim against UNB, failed to prosecute the cross-claim, and failed to serve them upon UNB. Following a hearing on UNB's motion, the trial court, on April 2, 1986, dismissed CLM's cross-claims for failure to prosecute pursuant to SDCL 15–6–41(b) and one year inactivity under SDCL 15–11–11 and also because the cross-claims were never served upon UNB. No appeal was taken therefrom by CLM or by Gilbert, as the assignee of CLM's claims against UNB.

### B. *CLM's claims against UNB as asserted by Gilbert as assignee.*

On June 6, 1986, Gilbert filed a second amended complaint against UNB. In addition to restating Gilbert's two individual claims, this complaint alleged the two CLM claims assigned to Gilbert, which had been dismissed. Gilbert also alleged that UNB was negligent toward CLM in handling the account of CLM, its depositor. This claim was not previously asserted by CLM. On July 10, 1986, UNB moved for summary judgment on the second amended complaint based on the doctrine of collateral estoppel. No issues of material fact were claimed or raised with respect to these assigned CLM claims. The trial court granted UNB's motion on the basis of collateral estoppel.

■ Gilbert argues that the court improperly granted summary judgment on the CLM claims assigned to and asserted by Gilbert based on collateral estoppel. For reasons stated below, Gilbert is correct as to collateral estoppel. However, as assignee, Gilbert holds no better claim than that held by CLM.

As a general rule [an assignee] takes the subject of the assignment with all the rights and remedies possessed by or available to the assignor, and a claim good in the hands of an assignor which is good against the original debtor is ordinarily equally good and free from defenses in the hands of his assignee....

In an action on the claim assigned, the assignee is ordinarily subject to any set-

off or counterclaim available to the obligor against the assignor and to all other defenses and equities which could have been asserted against the [claim] in the hands of the assignor at the time of the assignment. (footnotes omitted).

6 Am.Jur.2d *Assignments* § 102 (1963).

Though Gilbert asserts that UNB was negligent in handling CLM's account, CLM failed to assert negligence against UNB in its 1982 cross-claim or at any other time. CLM's causes of action against UNB, including any claim of negligence, arose in 1979, and would be subject to the six-year limitation period under SDCL 15–2–13, or the shorter three-year limitation period under SDCL 15–2–14. UNB's motion for summary judgment or dismissal asserted that "any purported claims ... would be time barred by the statute of limitations." This motion was sufficient to challenge any claim of negligence. Therefore, CLM's negligence claim is barred for failing to plead it within the above limitation periods.

■ The claims asserted in CLM's 1982 cross-claim would also be subject to the court's determination of UNB's motion for summary judgment or dismissal. CLM assigned its claims to Gilbert prior to the trial court's dismissal of CLM's cross-claims. However, SDCL 15–6–41(b) provides that "For failure of the plaintiff to prosecute ... a defendant may move for dismissal of an *action* or of *any claim* against him." (emphasis added). The record is clear that the trial court intended to dismiss all of CLM's claims for failure to prosecute. The assignment to Gilbert did not correct four years of inactivity by CLM and Gilbert takes the assignment with no better claim than held by CLM. 6 Am.Jur.2d *Assignments, supra.* Gilbert's counsel was present at the hearing and resisted the dismissal of CLM's claims. In addition, insufficient time elapsed after the assignment to permit any new activity by Gilbert's counsel to resurrect the claims. *Schwartzle v. Austin Co.*, 429 N.W.2d 69 (S.D.1988); *Holmoe v. Reuss*, 403 N.W.2d 30 (S.D.1987); *Duncan v. Pennington Co. Housing Auth.*, 382 N.W.2d 425 (S.D.1986).

■ As indicated above, the trial court was incorrect in using collateral estoppel as the reason for granting summary judgment because: 1) the issues were not identical; 2) the original dismissals were based on failure to prosecute rather than on the merits of the causes of action; and 3) at the time of the original dismissals CLM's claims were already owned by Gilbert, not CLM. *Cook v. Rezek*, 296 N.W.2d 731 (S.D.1980). CLM's claims, though assigned, were subject to dismissal for lack of prosecution and inactivity, just as any negligence claim was time barred, whether in the hands of CLM or Gilbert. *Holmoe, supra; Duncan, supra.* Thus, the trial court was correct in granting UNB's summary judgment motion on Gilbert's claims as assignee of CLM. We will not reverse where the trial court reached the correct result, though based on the wrong reason. *Cook, supra; Uken v. Sloat*, 296 N.W.2d 540 (S.D.1980); *Owens v. City of Beresford*, 87 S.D. 8, 201 N.W.2d 890 (1972).

### C. *Gilbert's individual claims.*

The trial court also granted summary judgment on Gilbert's individual claims of negligence and implied trust asserted in the second amended complaint. The court based this judgment on UNB's motion and supporting brief, which argued that UNB owed no duty to Gilbert and that no implied trust was created.

#### 1. *Gilbert's negligence claim.*

■ Gilbert claims that UNB was negligent in permitting CLM funds to be fraudulently transferred to a phony corporation. He argues that there were numerous "red flags" during UNB's dealings with Etter, Ensz, and Nelson which should have led to further inquiry and investigation by UNB prior to transferring the funds. Gilbert claims that UNB's actions raise a jury question and that the trial court improperly granted summary judgment as to UNB's negligence. He cites *Lovell v. Oahe Electric Co-op*, 382 N.W.2d 396, 399 (S.D.1986), which states that "questions relating to negligence ... are generally questions of fact for the jury."

Actionable negligence requires a duty on the part of the defendant to protect the plaintiff. *Erickson v. Lavielle*, 368 N.W. 2d 624 (S.D.1985); *Blumhardt v. Hartung*, 283 N.W.2d 229 (S.D.1979). The determination of whether a duty exists is a question of law for the court. *Erickson, supra;* 57 Am.Jur.2d *Negligence* § 37 (1971). For the law to impose a duty, a sufficient relationship must exist between the parties. *Erickson, supra; Cuppy v. Bunch*, 88 S.D. 22, 214 N.W.2d 786 (1974).

UNB persuasively argues that it owed no duty to Gilbert as an outsider to the transaction. Courts have recognized that a stranger to a bank-depositor relationship is owed no duty in the absence of a contract, statute, or other special circumstance giving rise to such a duty. *Sheiman v. Lafayette Bank & Trust Co.*, 4 Conn.App. 39, 492 A.2d 219 (1985); *Portage Aluminum Co. v. Kentwood Nat'l Bk.*, 106 Mich.App. 290, 307 N.W.2d 761 (1981); *Pennsylvania National Turf Club Inc. v. Bank of West Jersey*, 158 N.J.Super. 196, 385 A.2d 932 (1978), *petition for certification denied* 77 N.J. 506, 391 A.2d 520 (1978). Gilbert presents no authorities to challenge this position, nor does he argue that special circumstances exist to create such a duty. In absence of such special circumstances UNB owed no duty to Gilbert as a matter of law. *Erickson, supra.* Therefore, the trial court properly granted summary judgment on Gilbert's negligence claim.

### 2. *Gilbert's implied trust claim.*

Gilbert claims that an implied trust in the GSC–CLM account arose in his favor. He bases this claim on SDCL 40–15–31,[2] which provides:

> No livestock auction agency shall make such use or disposition of funds in its possession or control as will endanger or impair the faithful and prompt account-

ing for any payment or such portion thereof as may be due the owner or consignor of livestock or other persons having an interest therein, and to this end shall so handle all such funds as to prevent their being intermingled or confused with other accounts or funds of the auction agency kept or used for other purposes.

Gilbert argues that this statute transformed the deposited funds into a special deposit and created an implied trust under SDCL 55–1–8 and SDCL 55–1–9.[3] Gilbert further argues that UNB should have known the special nature of these funds and the protection afforded livestock sellers such as Gilbert under SDCL 40–15–31.

■ Gilbert's interpretation of SDCL 40–15–31 would place an obligation on UNB to inquire as to the claims of owners or consignors of livestock simply because UNB knew the deposited funds were connected with CLM. SDCL 40–15–31 does not require a bank to inquire as to the source (or future use) of the funds where deposits of a livestock auction agency are transferred to that bank from another bank. The only affirmative obligation *created* under this statute is imposed on the livestock auction agency itself. Some of Gilbert's arguments may apply to a bank maintaining an account for a livestock auction agency, but not to a subsequent transferee bank.

■ A bank may also become a trustee, under the implied trust statutes, where it has knowledge that money is deposited for a special purpose. *Calmenson Clothing Co. v. First Nat'l Bk. and Trust Co.*, 63 S.D. 338, 258 N.W. 555 (1935). However, there is no indication that UNB had knowledge that the deposited funds consisted of money claimed to be owed to Gilbert or other sellers of livestock. Gilbert has claimed but has not presented any facts to show that the deposited funds were owed

---

**2.** Some minor amendments have since been made to this statute by 1988 S.D.Sess.L. ch. 325.

**3.** SDCL 55–1–8 provides:

> One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust or other wrongful act, is, unless he has some other and better right thereto, an implied trustee of the thing gained for the bene-

fit of the person who would otherwise have had it.

SDCL 55–1–9 provides:

> Everyone to whom property is transferred in violation of a trust holds the same as an implied trustee under such trust, unless he purchased it in good faith and for a valuable consideration.

to him for livestock. The UNB transaction was completed and closed before the Sumitomo checks were issued to Gilbert. Unlike the situation urged by the dissent in *Estate of Jahnel v. First N.W. Trust Co.*, 428 N.W.2d 528, 533 (S.D.1988) (Sabers, J., dissenting), UNB does not have the funds but was simply a temporary conduit through which the funds passed. UNB is not an implied trustee under either SDCL 55–1–8 or 55–1–9 under the circumstances of this case.

Although Gilbert's allegations of fraud may stand against CLM, Etter, Ensz, Nel-son, and even Dockendorf, Gilbert makes no allegations of fraud against UNB in this case. Therefore, summary judgment is affirmed.

All the Justices concur.