2001 SD 11

**Kim TSCHETTER, Marvis Tschetter, a/k/a Marvie Tschetter, Clarence Tschetter and Goldie Tschetter, Plaintiffs and Appellants,**

v.

**James L. BERVEN, William J. Folkerts, and Venerts Investment, Inc., a South Dakota Corporation, Defendants and Appellees.**

Nos. 21474, 21500.

Supreme Court of South Dakota.

Argued Nov. 29, 2000.

Decided Jan. 17, 2001.

Lee Schoenbeck, John W. Burke, Schoenbeck Law Office, Watertown, SD, Attorneys for plaintiffs and appellants.

Thomas K. Wilka of Hagen, Wilka & Archer, Sioux Falls, SD, Attorneys for defendants and appellees.

SABERS, Justice

[¶ 1.] Marvie and Kim Tschetter, Clarence and Goldie Tschetter (Tschetters) purchased units from Venerts Investment, Inc., James Berven, and William Folkerts (Venerts) in Huron Kitchen LLC, a limited liability company, (Huron LLC) the entity which would construct and own a Country Kitchen restaurant. Tschetters claimed that: 1.) these units constitute securities under South Dakota law, and that: 2.) Venerts breached their duty in failing to assess the suitability of Tschetters for investment in Huron LLC. The trial court denied Tschetters' motions for summary judgment and granted judgment to Venerts by dismissing Tschetters' claims as a matter of law. We affirm.

## FACTS

[¶ 2.] In 1994, Venerts entered into an agreement with Country Hospitality Corporation (CHC) to develop several Country Kitchen restaurants over a period of years. Venerts contacted Marvie and Kim Tschetter after learning from the architect retained by Country Kitchen that Tschetters were interested in the investment. Venerts contacted Clarence and Goldie, Marvie's parents, after learning from Marvie that they were also interested. Venerts met with Tschetters and provided them a business plan which described the project.

[¶ 3.] After additional meetings with Venerts, Tschetters eventually invested in Huron LLC. Marvie and Kim purchased 6.750 units for $33,750.00, representing one ownership share of a total of eleven in Huron LLC. Clarence and Goldie purchased 13.5 units for $67,500, making them owners of two shares in Huron LLC. An operating agreement was entered into on April 4, 1995 and the Country Kitchen in Huron was opened in the fall of 1995.

[¶ 4.] Several months later, financing difficulties caused Tschetters and others to personally guarantee loans from First Madison Bank to Huron LLC. Nevertheless, the Country Kitchen continued to experience financial difficulties and closed November 1996. After the restaurant closed, First Madison Bank commenced an action against the personal guarantors, including Tschetters, to recover the monies loaned. Tschetters responded with cross-claims against Venerts for negligence and breach of South Dakota's Uniform Securities Act.

[¶ 5.] Tschetters moved for summary judgment asserting that: 1.) the units in the Huron LLC are "securities" under SDCL 47–31A–401(m); and 2.) Venerts owed a duty to determine the suitability of Tschetters to invest in Huron LLC.

The trial court denied both motions. Tschetters appeal. Venerts filed a notice of review of: 3.) the trial court's decision denying the admissibility of evidence concerning settlement negotiations to prove Tschetters' role in Huron LLC.

## STANDARD OF REVIEW

■ [¶ 6.] Our standard of review for summary judgment is well-established:

> In reviewing a grant or denial of a summary judgment under SDCL 15–6–56, we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law.

*Kern v. City of Sioux Falls*, 1997 SD 19, ¶ 4, 560 N.W.2d 236, 237. "The determination of whether a duty exists is a question of law for the court." *Gilbert v. United Nat. Bank*, 436 N.W.2d 23, 27 (S.D.1989). Similarly, "the construction of a statute and its application to the case at hand presents a question of law." *Shevling v. Butte County Bd. of Comm'rs*, 1999 SD 88, ¶ 12, 596 N.W.2d 728, 730. "Whether an instrument is a security is a question of law." *Nutek Information Systems, Inc., v. Arizona Corporation Commission*, 194 Ariz. 104, 977 P.2d 826, 829 (Ct.App.1998); *see also Securities Exchange Commission v. W.J. Howey, Co.*, 328 U.S. 293, 297, 66 S.Ct. 1100, 90 L.Ed. 1244, 1249 (1946). "We review questions of law de novo." *Hamerly v. City of Lennox Bd. of Adj.*, 1998 SD 43, ¶ 10, 578 N.W.2d 566, 568.

[¶ 7.] **1. WHETHER THESE UNITS IN HURON LLC ARE SECURITIES UNDER SOUTH DAKOTA'S UNIFORM SECURITIES ACT.**

■ [¶ 8.] This case presents a question of first impression in South Dakota. "We start with the proposition that statutes governing the registration and sale of securities are remedial in nature and are designed to protect the unwary buyer and thus should be liberally construed." *Hofer v. General Discount Corp.*, 86 S.D. 133, 192 N.W.2d 718, 722 (1971). However, to receive this liberal construction Tschetters must establish that the units they purchased are securities.

[¶ 9.] In South Dakota, "security" is defined as:

> any note; stock; treasury stock; bonds; debentures; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificates; preorganization certificate or subscription; transferable shares; investment contracts; voting-trust certificates; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; viatical settlement; or, in general, any interests or instrument commonly known as a security, or any certificate of interest or participation in, temporary or interim certificate for, receipt for guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. Security does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay a fixed sum of money either in a lump sum or periodically for life or some other specified period.

SDCL 47–31A–401. Tschetters contend that the units they purchased in Huron LLC are "investment contracts" and therefore "securities" under SDCL 47–31A 401.[1] South Dakota's definition of "securi-

---

1. In addition to asserting that the "units" constitute an "investment contract" Tschetters also argue that the "units are commonly known as securities" and, therefore, meet the definition of 47–31A–401. However, as recognized by the United States Supreme Court: We perceive no distinction for present purposes, between an 'investment contract' and an 'instrument commonly known as a security.' In either case, the basic test for distinguishing the transaction from other commercial dealings is 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.'

ty" is substantially similar to the definition of "security" in the Securities Act of 1933 and the Securities Exchange Act of 1934. *See* Securities Act of 1933, 15 USCA 77(b)(1) (1997); Securities Exchange Act of 1934, 15 USCA 78(c)(a)(10) 1997. Therefore, we look to courts interpreting similar provisions for guidance.

■ [¶ 10.] "We must therefore begin where all analyses of investment contracts start, with *Securities & Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)."[2] *Williamson v. Tucker*, 645 F.2d 404, 417 (5th Cir.1981) *cert denied* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). LLC membership interests constitute "securities" if they fulfill the criteria established by the United States Supreme Court in *Howey*. *Keith v. Black Diamond Advisors, Inc.*, 48 FSupp 2d 326 (S.D.N.Y.1999); *KFC Ventures, LLC v. Metaire Medical Equipment Leasing Corp.*, 2000 WL 726877, *2 (E.D.La.2000). The United States Supreme Court has stated that an "investment contract" is a " 'security' when a person 1.) invests money 2.) in a 'common enterprise' and 3.) is led to expect profits solely from the efforts of the promotor or a third party." *Nutek*, 977 P.2d at 830 (citing *Howey*, 328 U.S. at 301, 66 S.Ct. at 1100, 90 L.Ed. at 1244.)

[¶ 11.] The critical inquiry is the third prong of the *Howey* test-whether Tschetters were led to expect profits solely from the efforts of the promotor or a third party. We acknowledge, as other courts have done, that the use of the term "solely" is "not to be taken literally." *Id.* "Rather, the third prong is satisfied if 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which effect the failure or success of the enterprise.' " *Nutek*, 977 P.2d at 830; *citing*

*SEC v. Glenn W. Turner Enters. Inc.*, 474 F.2d 476, 482 (9thCir.1973). The United States Supreme Court has also noted the definition of a security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others in the promise of profits." *Howey*, 328 U.S. at 299, 66 S.Ct. at 1103, 90 L.Ed. at 1250.

[¶ 12.] The leading case interpreting the third prong of the *Howey* test is *Williamson v. Tucker*, 645 F.2d at 404. *Williamson* approaches this inquiry by recognizing that substance should take precedence over form. *Id.* at 422–23. The *Williamson* court set forth three factors to aid in this determination:

1.  an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or

2.  the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or

3.  the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager or the enterprise or otherwise exercise meaningful partnership or venture powers.

*Id.* at 424. These factors are not all-inclusive, and other considerations may come into play in each case. *Id.* at n. 5. In addition, we do not isolate these factors but consider them as a whole. *Koch v. Hankins*, 928 F.2d 1471, 1476–78 (9thCir.1991); *Nutek*, 977 P.2d at 831.

■ [¶ 13.] Based on the evidence in the record and South Dakota law, Tschet-

*United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621, 632 (1975).

**2.** Tschetters suggest the use of three other tests to make this determination, however,

*Howey's* common enterprise test is the majority rule and we find it persuasive, especially as interpreted in Williamson. *See infra* for discussion.

ters had substantial rights and powers. South Dakota law vests the members of an LLC with management powers in proportion to their contribution of capital. SDCL 47–34–16. The members have the power to elect the managers of the LLC and set their responsibilities.

[¶ 14.] In addition, the Operating Agreement vested management powers of the Huron LLC in its members, which included Tschetters. These members were given notice of meetings and any member could call a meeting. The day-to-day decisions were made by two managers who were required to be members of the Huron LLC, and selected by the other members. The Huron LLC maintained and provided access to all records of actions taken by its members. Members could authorize loans on behalf of the company by agreement. The members had the authority to select an attorney to review the legal affairs of the Huron LLC. The members had the right to receive profits and distributions when warranted. The members could authorize incidental expenses within an aggregate of $12,500. The members were empowered to make any other routine actions incidental to the day-to-day activity of Huron LLC. The members were allowed to select officers for the Huron LLC and could remove the accountant with or without cause.

[¶ 15.] The Huron LLC's operating agreement establishes that substantial power and responsibility was vested in its members. The record also establishes that Marvie, acting for all the Tschetters, exercised substantial control over the affairs of Huron LLC. Apparently, Clarence and Goldie acquiesced in relying on Marvie and Kim for information and action. The minutes kept by the Huron LLC show that Tschetters were informed and active in this entity. Tschetters actions on behalf of Huron LLC after the restaurant began to fail shows they were aware of and capable of exercising the powers which they held as members.

[¶ 16.] Tschetters stress the fact that Huron LLC entered into a management agreement with CHC to establish their dependence on the efforts of others. However, our inquiry is the Tschetters role in the Huron LLC. The fact that Huron LLC acquiesced in management powers to CHC is not determinative. The Huron LLC retained the ability to terminate the management contract if the manager failed to perform "any material covenant, agreement, term or provision … for a period of thirty days." Apparently, here, the failure to perform exceeded a period of thirty days several times over. The management agreement required CHC to "direct, supervise, manage, and operate the [r]estaurant in an efficient and economical manner," "execute a marketing plan to attract guests," "determine and arrange to contract for all advertising and promotion [ ] deem[ed] necessary and appropriate for the operation of the [r]estaurant." Apparently, the failure to perform as required caused CHC's termination. The management agreement does not divest all power from Huron LLC but, instead, provides Tschetters and other members of Huron LLC substantial power and ability to conduct the necessary oversight of the restaurant's operation.

[¶ 17.] The record fails to establish that this was a situation where the managers were so dominant that the members would be lost without them. *See Nutek*, 977 P.2d at 833. "The mere choice by a partner to remain passive is not sufficient to create a security interest." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240–41 (4thCir.1988). This determination "does not and should not hinge on the particular degree of responsibility assume[d] within the firm, nor does the delegation of membership responsibilities, or the failure to exercise membership powers, 'diminish the investor's legal right to a voice in partnership or company matters.'" *Keith*, 48 FSupp.2d at 334 (quoting *Hirsch v. du-Pont*, 396 F.Supp. 1214 (S.D.N.Y.1975)).

We acknowledge that the investor asserting that an "investment contract" constitutes a "security" has a "difficult burden to overcome." *Nutek,* 977 P.2d at 831.

[¶ 18.] Tschetters have the burden of establishing that their expectation of profits was based on the entrepreneurial efforts of others to establish an "investment contract." As indicated in one treatise, only in unusual circumstances would a member-managed LLC "be able to argue that they must rely on the entrepreneurial efforts of others rather than on their own management skills." Carol Goforth, *Why Limited Liability Company Membership Interests Should Not Be Treated As Securities and Possible Steps to Encourage This Result,* 45 Hasting L.J. 1223, 1275 (1994). This may be especially true when, as here, the investment related to a restaurant, rather than complicated communications systems, as in *Nutek.* In such an entity, the members retain substantial power over the LLC. *Id.* "The general framework is essentially antithetical to the notion of member passivity."

[¶ 19.] We hold that the third prong of the *Howey* test, as interpreted by *Williamson,* has not been met. In other words:

1. This agreement did not leave so little power in the hands of the partner as a limited partnership would;

2. The partner or venturer was not so inexperienced and unknowledgeable in the business affairs as to be incapable of intelligently exercising his partnership or venture powers; or

3. The partner was not so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace [him] or otherwise exercise meaningful partnership or venture powers.

[¶ 20.] If an interest in a limited liability company constitutes a "security," then that entity must comply with our securities law or exempt themselves from the application of those laws. This question can only be addressed on a case-by-case basis. Here, Tschetters did not sustain their burden. These "units" were not "securities" under this law and we affirm issue 1.

[¶ 21.] **2. WHETHER VENERTS HAD A DUTY TO ASSESS THE SUITABILITY OF TSCHETTERS FOR INVESTMENT IN HURON LLC.**

[¶ 22.] "[I]t is generally recognized that one who undertakes to provide professional services has a duty to the person for whom the services are performed to use such skill and care ordinarily exercised by others in the same profession." *Limpert v. Bail,* 447 N.W.2d 48, 51 (S.D.1989). Tschetters assert that such a duty was created when they filled out a "suitability agreement" which was reviewed by Venerts. If this is the law in this case, the Venerts would be required to "exercise due care in the performance of [their] assumed obligation." *Id.*

[¶ 23.] Whether Venerts assumed a duty of care is a question of law. *See Tipton v. Town of Tabor,* 538 N.W.2d 783, 785 (S.D.1995). This duty "may be defined as an obligation [ ] which the law will give recognition and effect." *Hoekman, v. Nelson,* 2000 SD 99, ¶ 8, 614 N.W.2d 821, 823. Tschetters have the burden to prove that such a duty existed. *Id.* at ¶ 12.

[¶ 24.] The only evidence Tschetters offer to support their contention that a duty existed is the "suitability agreement" itself. Examining this document, we find that it did not create a legal duty. This is not a situation where Venerts undertook to perform a contractual duty. *See Mark, Inc. v. Maguire Ins. Agency, Inc.,* 518 N.W.2d 227, 231 (S.D.1994) (Sabers, J., dissenting). It is apparent from examining the "suitability agreement" that it was not a task assigned to Venerts, but, instead, a device to benefit Tschetters by forcing them to think about their investment and at the same time providing assurance to Venerts of their investors' fi-

nancial position. This benefit does not alone create a legal duty.

[¶ 25.] The form was completed by Tschetters and individually signed by each. It provided a brief statement of the financial security of Tschetters, and indicated that Tschetters "to the extent [deemed] necessary, [obtained] personal and professional advice from a financial advisor with respect to the risks inherent in this investment."

[¶ 26.] This "suitability agreement" does not create a legal duty for Venerts. Instead, it focuses responsibility on Tschetters. The best description for this instrument would be a "wake up call" for Tschetters to further consider their investment decision. This instrument did not create a legal duty for Venerts to advise Tschetters about potential risk.

[¶ 27.] We affirm issue 2.[3]

[¶ 28.] We conclude that the trial court correctly granted summary judgment in favor of Venerts. Therefore, it is not necessary to address issue 3.

[¶ 29.] KONENKAMP and AMUNDSON, Justices, concur.

[¶ 30.] MILLER, Chief Justice, and GILBERTSON, Justice, concur in part and dissent in part.

GILBERTSON, Justice (dissenting in part and concurring in part).

[¶ 31.] I respectfully dissent as to Issue One. I would hold there is a question of fact as to whether the investment made by the Tschetters constituted a security under SDCL 47–31A–401. I would reverse and remand for trial on this cause of action.

[¶ 32.] I initially part company with the Court on its treatment of the standard of review. Although the trial court granted

summary judgment in favor of Venerts, this Court would treat the issue as a question of law. Its authority for that position, *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) and *Nutek Info. Sys., Inc. v. Arizona Corp. Comm'n*, 194 Ariz. 104, 977 P.2d 826, 829 (Ct.App. 1998) were appellate reviews of a completed bench trial. The parties already had their day in court and the appeal was based on the full record of the trial court's decision on the merits.

[¶ 33.] Federal and state appellate courts that have addressed the issue of the appropriate standard of review of a grant or denial of summary judgment in securities cases have applied the normal summary judgment standard of review. *Smith v. Gross*, 604 F.2d 639, 641 (9th Cir.1979); *Great Western Bank v. Kotz*, 532 F.2d 1252, 1254 (9th Cir.1976); *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 487 (9th Cir.1974); *South Western Oklahoma Develop. Auth. v. Sullivan Engine Works, Inc.*, 910 P.2d 1052, 1059 (Okla. 1996); *Feninger v. Capital Accumulations Services, Inc.*, 439 Pa.Super. 366, 654 A.2d 560, 561–62 (1994). There is no basis to depart from our settled standard of review of the granting of a motion for summary judgment. When reviewing a trial court's decision to grant summary judgment, we will affirm only if all legal questions have been decided correctly and there are no genuine issues of material fact. *Holzer v. Dakota Speedway*, 2000 SD 65 ¶ 8, 610 N.W.2d 787, 791 (citations omitted). The nonmoving party will receive the benefit of all reasonable inferences that can be drawn from the facts. *Id.* The Court puts the burden on the wrong party when it concludes, "[h]ere, Tschetters did not sustain their burden."[4] Because the trial

---

**3.** South Dakota's Uniform Securities Act does not apply as we hold the "units" did not constitute "securities" as defined therein.

**4.** Further examples of the misapplication of the standard of review and how it affected the Court's erroneous outcome are: "However, to

receive this liberal construction Tschetters must establish that the units they purchased are securities." "Tschetters have the burden of establishing that their expectation of profits was based on the entrepreneurial efforts of others to establish an 'investment contract.'" Under the proper standard of review, the bur-

court granted summary judgment in favor of Venerts, the burden should have been placed on Venerts as the moving party, not the Tschetters.

[¶ 34.] I agree with the Court that the criteria set forth in *Howey* provides the applicable standard to address the issue. However, the form of the investment (an LLC) is not the exclusive factor. *Williamson v. Tucker*, 645 F.2d 404, 423 (5th Cir.1981). Each case is to be judged on its own facts and not upon the designated label attached to the investment. *Howey*, 328 U.S. at 298, 66 S.Ct. at 1102, 90 L.Ed. at 1249; *Nutek*, 977 P.2d at 836. The determinative issue is whether there is a question of fact that Tschetters would obtain profits from the entrepreneurial and managerial efforts of others.

[¶ 35.] The timeline of the events involved in this case is critical when examining the rights held by Tschetters in Huron LLC. Articles of Organization of Huron Kitchen, LLC, as a limited liability company, were signed by Folkerts and Berven on March 29, 1995. While the Tschetters were considering this investment, they were provided with a Business Plan for Huron LLC dated March 16, 1995 in which Berven and Folkerts as owners of Venerts, set forth their expertise at "areas of business development." [5] In the Business

---

den is on the defendants to show that the units in Huron LLC were *not* securities and that the Tschetter's expectation of profits were *not* based on the efforts of others.

5. The complete text of Folkerts' and Bervin's self-stated qualifications in the Business Plan is as follows:

[William (Bill) J. Folkerts] graduated from Mitchell High School and went on to South Dakota State University where he received both B.S. and M.S. degrees in Agriculture and Economics. After more then [sic] 25 years working in the areas of business development, loan packaging, business counseling, loan servicing and technical assistance to local unit(s) units [sic] of government. His specialty was community economic development projects in the east-central part of the State. He provided direct management assistance for more than 9 years to many business and industrial clients.

Folkerts and his wife have been active in the residential rental business for over 18 years. Their holdings include single family houses up to multi-family units. *In addition to these projects, Folkerts was instrumental in forming limited partnerships and "S" Corporations that own real estate.*

He serves on numerous Corporate Boards of Directors and he along with his partner has developed c-store [sic], apartments, motels and restaurants. Some of these projects include: Governor's Inn Pierre; Comfort Inns [sic] in Vermillion; Comfort Inn Watertown; Sleep Inn Sioux Falls, Country Inn and Suites Sioux Falls; Country Kitchen Sioux Falls; Country Kitchen–Watertown; Country Inn and Suites Dakota Dunes; Country Kitchen–Dakota Dunes and Pump N' Pak–Watertown.

Venerts owned by Folkerts and Jim Berven is a[sic] investment development and management company that has management contract [sic] with the motels.

\* \* \*

[James (Jim) L. Berven] graduated from Augustana College in 1961 with a Bachelor of Science in Business Administration.

\* \* \*

Berven received the designation of Certified Residential Specialist (CRS) and the coveted Certified Real Estate Brokerage Manager (CRB). He was selected as REALTOR of the year by the Watertown Board of Realtors in 1977 and 1981 and was also REALTOR of the Year for the South Dakota Association of REALTORS in 1981.

\* \* \*

Presently, Berven is President of Berven Realty, Inc. a real estate brokerage and investment company, and serves as Chief Operating Officer of BFR Properties, Inc. a general construction company specializing in custom quality residential and commercial building projects.

\* \* \*

He serves on numerous Corporate Boards of Directors and he along with his partner has developed c-store, [sic] apartments, motels and restaurants. Some of these projects include: Governor's Inn–Pierre; Comfort Inns [sic] in Vermillion; Comfort Inn–Watertown; Sleep Inn Sioux Falls, Country Inn and Suites Sioux Falls; Country Kitchen–Sioux Falls; Country Inn and Suites–Dakota Dunes; Country Kitchen Dakota Dunes and Pump N' Pak Watertown. (emphasis added).

Plan, Berven and Folkerts designated themselves as the "Project Development Team," and informed the Tschetters that the "Management Team" of the Huron Country Kitchen would be as follows:

> Country Kitchen International by Carlson Hospitality *will be the managers of the Country Kitchen.* The management contract with Huron Kitchen, L.L.C. will be for 15 years and it has renewable options. (emphasis added).

That management agreement was reached in July of 1995 between Venerts and Country Kitchen binding Huron LLC to a 15 year management contract. The agreement was formally executed on August 28, 1995. Tschetters did not receive their shares, which entitled them to the rights and privileges of investors, until September 6, 1995, when the LLC conducted its organizational meeting. By the time the Tschetters received their interests in Huron LLC, their hands had effectively been tied by Venerts through the management agreement with CKI. The situation Tschetters were placed in is similar to the investors in *Nutek*, where "the members had little or no input in deciding to enter into these agreements because the agreements were already in place before [the] members were recruited to invest...." *Nutek*, 977 P.2d at 832.

[¶ 36.] While Huron LLC was a separate legal entity, the sole asset of the LLC was the restaurant, which was subject to the management agreement negotiated by

---

Venerts. The United States Supreme Court has repeatedly noted that when examining securities law issues, the economic reality of a situation, rather than the form, will control. *Reves v. Ernst & Young*, 494 U.S. 56, 61, 110 S.Ct. 945, 949, 108 L.Ed.2d 47 (1990); *Int'l. Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 796, 58 L.Ed.2d 808 (1979); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 848, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975). The economic realities of this situation suggest that the restaurant and Huron LLC were one investment. Without the restaurant, Tschetters would not have invested in Huron LLC. Therefore, I disagree with the Court's assertion that our inquiry is limited to Tschetters' role in Huron LLC. While the terms of the LLC agreement on paper would indicate that Tschetters, as members, were given an opportunity to participate in management decisions, in reality, they were already locked out by the previously signed 15-year management agreement with CKI at the time of their investment.[6] The terms of the agreement gave "exclusive supervision and control" of the restaurant to CKI as manager. The agreement further stated that the "[m]anager shall have discretion and control, free from interference, interruption, or disturbance, in all matters relating to the management and operation of the Restaurant subject only to those specific approvals of Owner as set forth herein."[7] Thus, Tschetters were denied

---

**6.** The Court emphasizes that the Operating Agreement of Huron LLC signed by Berven and Folkerts on April 4, 1995, declared that the business and direction of the LLC were to be under the authority of two managers who shall be elected annually and must be investor members of the LLC, thereby giving the Tschetters "substantial control over the affairs of Huron LLC." However, prior to the time the Tschetters made their investment, the exclusive management of the sole asset of the LLC, the restaurant, had been handed over to CKI per the 15 year management agreement.

**7.** The following text from the Management Agreement are examples of the total authority

contracted away by Venerts, on behalf of the LLC, to CKI:

> 2.2 *Delegation of Authority. Operation of the Restaurant shall be under the exclusive supervision and control of the Manager which shall be responsible for the proper and efficient operation of the Restaurant. Manager shall have discretion and control, free from interference, interruption, or disturbance, in all matters relating to management and operation of the Restaurant subject only to those specific approvals of Owner as set forth herein.* Such authority of Manager shall include, but is not limited to, promotion and publicity programs, credit policies, employment and hiring pol-

control from the outset by the CKI management contract.

[¶ 37.] Furthermore, the applicable test is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Williamson,* 645 F.2d at 418 (quoting *S.E.C. v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.1973)). Under the terms of the management contract, Tschetters were precluded from exercising any managerial efforts over · the enterprise, namely the restaurant.

> When the owners of a limited liability company are not expected to exercise control over the day-to-day business operations ... interests in limited liability companies should be classified as investment contracts, except in those instances in which the investor will be playing a substantial role in the management of the business.

Thomas Lee Hazen, *The Law of Securities Regulation* § 1.5, at 60 (3d ed. 1995). *See Lino v. City Investing Co.,* 487 F.2d 689, 692 (3rd Cir.1973) (stating that "an investment contract can exist where the investor is required to perform some duties, as long as they are nominal or limited and would have 'little direct effect upon receipt by the participant of the benefits promised by the promoters.' "). In addition, when determining the degree of control an investor holds, we should look to the "practical as well as legal ability to control" the enterprise. *Hocking v. Dubois,* 885 F.2d 1449, 1460 (9th Cir.1989); *Nutek,* 977 P.2d at 831. Clearly, any rights exercisable by Tschetters would have had little effect on the management of the restaurant. At the very least, there is a question of fact as to their authority exercisable over the enterprise.

[¶ 38.] The Court also misconstrues the authority of the LLC to terminate the management contract with CKI. Neither the LLC nor Tschetters could do so at their option or at their discretion as owners. The contract could only be terminated by the LLC upon the following applicable grounds:

> If Manager fails to keep, observe or perform any material convenant, agreement, term or provision of this Agreement and such default shall continue for a period of thirty (30) days after written notice thereof by Owner to Manager.

Thus, if the LLC terminated the management agreement for what it perceived to be "for cause," it faced a potential suit by CKI for breach of contract if the LLC could not prove a violation of the above provision. Given the fact there were fourteen years left to run on the management contact and the already precarious financial state of the LLC, damages for wrongful breach by the LLC would have been

icies, personal wage and compensation policies, receipt, holding and disbursement of funds, maintenance of bank accounts, procurement of inventories, supplies and services, and generally, all activities necessary for and incidental to the operation of the Restaurant.

\* \* \*

6.1 *Standards of Operation. On and after the Opening Date, the Manager shall have the exclusive right and duty to direct, supervise, manage, and operate the Restaurant in an efficient and economical manner in accordance with the standards and procedures as is customary and usual in the operation of a Country Kitchen® Restaurant and in accordance with the standard Country Kitchen® License Agreement, and* determine the programs and policies to be followed in connection therewith, all in accordance with the provisions of this Agreement. However, Manager agrees to consult with and obtain the approval of the Owner on all major programs and policy matters which could substantially affect the type and character of the Restaurant. *In order for the Manager to comply with the standards and procedures, the Owner hereby agrees that Manager shall have uninterrupted control and operation of the Restaurant during the term of this Agreement. The owner will not interfere or involve itself with the day-to-day operations of the Restaurant, and Manager may operate the Restaurant free from interference by the Owner or representative of the Owner.* (emphasis added).

catastrophic.[8] The LLC could not simply cancel this agreement with impunity as the Court suggests.

[¶ 39.] Beyond that, the LLC entered into the franchise investment because of its reliance upon CKI to provide franchise management. The Country Kitchen franchise agreement was still in effect even if the CKI management contract had been cancelled. Examination of the management agreement shows the LLC to be a substantially different business venture for an investor as opposed to the outright purchase of a local "mom and pop" restaurant. Where in the Huron, South Dakota area was the LLC to obtain a qualified replacement manager with the necessary franchise expertise if it dismissed CKI's management?[9] As was observed in *Williamson*:

> A genuine dependence on others might also exist where the partners are forced to rely on some particular non-replaceable expertise on the part of a promoter or manager. Even the most knowledgeable partner may be left with no meaningful option when there is no reasonable replacement for the investment's manger.... [T]he partners may have the legal right to replace the manager, but they could do so only by forfeiting the management ability on which the

success of the venture is dependent. Or investors may purchase joint venture interests in an operating business in reliance on the managing partner's unusual experience and ability in running that particular business; again, a legal right of control would have little value if the partners were forced to rely on the manager's unique abilities.

*Williamson*, 645 F.2d at 423. "Thus, the investors, not only had 'no reasonable replacement' for their manager, they in effect had. *no* replacement." *Nutek*, 977 P.2d at 834 (emphasis in original). *See, Koch v. Hankins*, 928 F.2d 1471, 1480 (9th Cir.1991) (stating that "the ready availability of alternative jojoba farm managers is [sufficiently] questionable" to create a question of fact.).

[¶ 40.] If Tschetters can show that CKI "was uniquely capable of such [managerial] tasks or that the [members] were incapable, within reasonable limits, of finding a replacement manager" they can satisfy the third prong of the *Howey* test. *Williamson*, 645 F.2d at 425. Here, unlike in *Williamson*, there is a question of fact as to whether the management contract "create[d] the sort of dependence implicit in an investment contract." *Id. See Koch*, 928 F.2d at 1481 (stating that "even if a general partner vigorously exercised his or her

---

8. The "basic management fee" to CKI was three percent of the gross sales for the full term of the fifteen-year agreement. Other financial obligations incurred by the LLC per the agreement which may or may not be claimed as damages by CKI in event of a breach of contract include a monthly advertising fee payable to Manger equal to two per cent of the gross sales. Manger also had authority to bind the LLC to a "national and regional advertising fund" not to exceed four per cent of the monthly gross sales. A reserve fund fee of two per cent of gross sales was also required. Although not applicable here because of chronic losses, the agreement also called upon the LLC to pay an "incentive fee" of ten percent of the net operating income minus debts.

Lest there be any doubts of CKI's position in event of a breach of contract by the LLC, the contract declared that CKI could "exercise any other remedy such party may have

at law or in equity upon the default of the other party.·...."

The management agreement was finally cancelled by LLC in November of 1996, not coincidentally the same month the restaurant closed due to the financial losses.

9. The Management agreement drafted by CKI stated its requirements for management of this type of franchise enterprise of which it found itself capable:

Manager has developed a business system for providing the public with food and restaurant services of a distinctive character under the name "Country Kitchen" ("the Business System") and has publicized the name "Country Kitchen" and other trademarks, trade names, service marks, logos, and commercial symbols to the public as an organization operating under the Country Kitchen Business System.

rights under the partnership agreement, he or she arguably could have no impact on the investment").

[¶ 41.] The Court views the conduct of Tschetters, particularly Marvie Tschetter, as exercising "substantial control" over the LLC. However, as is argued by Tschetters, their actions are in the nature of "somebody on the outside beating on the window trying to get in. Instead of making management decisions, they are left— as a result of the Restaurant Management Agreement—with only the ability to write letters complaining about how the investment is being managed." Further, a substantial portion of the actions by Tschetters were taken after the restaurant had undergone significant financial losses and its ability to survive under any circumstances was at best, very questionable.

[¶ 42.] Finally, I disagree with the Court's assertion that a member of an LLC has a "difficult burden to overcome" to show that his or her investment constitutes a security. The support for this assertion comes from *Williamson,* where that court noted that "an investor who claims his *general partnership or joint venture interest* is an investment contract has a difficult burden to overcome." *Williamson,* 645 F.2d at 424 (emphasis added). While there are similarities between an LLC and a general partnership, there are sufficient differences that justify different treatment. *See Nutek,* 977 P.2d at

833. The personal liability of a general partner provides an incentive to be highly involved in the enterprise, while at the same time discouraging unsophisticated investors. *Id.* at 833–34. Because a member in an LLC is shielded from personal liability, there is "less incentive to be informed about, or take an active role in, the business." *Id.* at 834. Therefore, we should not apply a strong presumption against an LLC interest being a security.

[¶ 43.] For all of the above reasons, I conclude a question of fact exists as to whether this investment by the Tschetters constituted a security under South Dakota law. As such, I would reverse and remand for trial on this issue.[10]

[¶ 44.] I agree with the Court on Issue Two.

[¶ 45.] I would not reach the notice of review issue raised by Venerts, as it was never certified by the trial court per SDCL 15–6–54(b) as part of this appeal.

[¶ 46.] MILLER, Chief Justice, joins this special writing.

---

10. The LLC had previously filed litigation against CKI. Apparently the parties settled this litigation.