2017 OK CIV APP 64

**Clinton COMBS, Plaintiff/Appellant,**

v.

**WEST SILOAM SPEEDWAY CORP., Rick Magnuson, Julie Magnuson, Joey Vaughn, and Ed Nunn, Defendants/Appellees.**

**Case Number: 115296**

Court of Civil Appeals of Oklahoma, Division No. 4.

Decided: 04/25/2017

Mandate Issued: 11/28/2016

Rehearing Denied 06/28/2017

Shawn Daniels, HARE, WYNN, NEW-ELL & NEWTON, LLP, Fayetteville, Arkansas, for Plaintiff/Appellant

Grant A. Fitz, Ryan D. Ensley, Alexandria N. Temple, RODOLF & TODD, Tulsa, Oklahoma, for Defendants/Appellees

DEBORAH B. BARNES, PRESIDING JUDGE

¶1 This case arises from injuries sustained by Plaintiff/Appellant Clinton Combs (Combs) while in the infield area of an automobile racetrack.[1] Combs asserts in his petition that one of the race car drivers "lost control" of his vehicle which then "came into the infield area where [Combs] was located," causing him injury. Combs appeals from the trial court's "Journal Entry of Judgment" granting the motion for summary judgment of Defendants/Appellees West Siloam Speedway Corporation, Rick Magnuson, Julie Magnuson, Joey Vaughn, and Ed Nunn (collectively, Defendants). Combs asserts in the Petition–in–Error on appeal that, among other things, the exculpatory agreement he signed upon entering the infield area of the racetrack, which he describes as a mere sign-in sheet, is not valid or enforceable as a release of liability. Based on our review of the record, we affirm.

## BACKGROUND

¶2 In his petition, Combs alleges that on September 11, 2010, he was struck by a race car while in the infield area of the West Siloam Speedway (hereafter, the entire race-track facility will be referred to as "the Speedway"). He alleges Defendant Nunn, who was driving the race car, was negligent "in failing to maintain control of his vehicle after it left the speedway track." He further alleges that Defendant West Siloam Speedway Corporation "was negligent in the design, and setup of the track, including without limitation, [failing] to have barriers put up that would prevent vehicles from entering the infield causing injury to unsuspecting parties." Similarly, Combs alleges that Defendants Julie and Rick Magnuson and Joey Vaughn "were negligent, including without limitation, in failing to have barriers set up to prevent out of control vehicles from entering the infield, and for allowing personnel to work in the infield area." Combs also asserts that he was injured as a result of the "recklessness" of Defendants and that Defendants' "actions and/or omissions ... were of such a nature so as to constitute conduct evidencing

1. The infield area is the area within, or surround-ed by, the racetrack.

reckless disregard for the rights of others, and in particular [Combs][.]"

¶ 3 Defendants admit that Combs, while in the infield area of the Speedway, was struck by the race car operated by Defendant Nunn. However, Defendants deny any liability for the accident. Indeed, in April 2015, Defendants filed a motion for summary judgment asserting they "are entitled to summary judgment on the basis that [Combs] not only signed a release barring any and all negligence claims against Defendants, but also because [Combs] assumed the risk by voluntarily participating in the speedway activities."

¶ 4 Combs, in his response to Defendants' motion for summary judgment, admits that on September 11, 2010, he "volunteered to help in the infield area of [the Speedway] in exchange for a waiver of his admission fee," but he asserts he was really "there [in the infield area] just to watch the races" with his five-year old son. Combs further admits he signed what Defendants describe as "the Release" prior to entering the infield area on September 11, 2010, but he asserts this document merely constituted, and was entitled, a "Staff Sign in" sheet, and he asserts the document "does not specifically release" any of the Defendants.

¶ 5 As stated above, the trial court granted summary judgment to Defendants. Combs appeals.

## STANDARD OF REVIEW

¶ 6 The review standard for the grant of summary judgment is de novo. *Wood v. Mercedes–Benz of Okla. City*, 2014 OK 68, ¶ 4, 336 P.3d 457. "Although a trial court in making a decision on whether summary judgment is appropriate considers factual matters, the ultimate decision turns on purely legal determinations, i.e. whether one party is entitled to judgment as a matter of law because there are no material disputed factual questions." *Carmichael v. Beller*, 1996 OK 48, ¶ 2, 914 P.2d 1051. "[T]he mere contention that facts exist or might exist is not sufficient to withstand summary judgment. The party responding to a motion for summary judgment has an obligation to present something which shows that when the date of trial arrives, he will have some proof to support his allegations." *Davis v. Leitner*, 1989

OK 146, ¶ 12, 782 P.2d 924 (footnotes omitted).

## ANALYSIS

### I. Release of Liability for Ordinary Negligence

¶ 7 "The Oklahoma Supreme Court has long recognized that exculpatory contracts, i.e., a contract to avoid liability for damages also known as a 'waiver' or 'release,' may be valid and enforceable." *Manning v. Brannon*, 1998 OK CIV APP 17, ¶ 6, 956 P.2d 156 (citations omitted). The *Manning* Court stated:

so long as (1) the intent to excuse one party from the consequences of his or her own negligence is expressed in clear, definite and unambiguous language, (2) the agreement was made at arm's length with no vast disparity of bargaining power between the parties, and (3) the exculpation is not contrary to statute or public policy, such a waiver or release from liability is valid and enforceable.

*Id.* (citations omitted).

¶ 8 In setting forth these precepts, the *Manning* Court relied primarily on *Schmidt v. United States*, 1996 OK 29, 912 P.2d 871. It is useful to set forth the Oklahoma Supreme Court's precise language in *Schmidt* pertaining to this issue:

While these exculpatory promise-based obligations are *generally enforceable*, they are *distasteful* to the law. For a validity test the exculpatory clause must pass a gauntlet of judicially-crafted hurdles: (1) their language must evidence a *clear and unambiguous* intent to exonerate the would-be defendant from liability for the sought-to-be-recovered damages; (2) at the time the contract (containing the clause) was executed there must have been *no vast difference* in bargaining power between the parties; and (3) enforcement of these clauses must never (a) be injurious to public health, public morals or confidence in administration of the law *or* (b) so undermine the security of individual rights vis-à-vis personal safety or private property as to *violate public policy*.

*Schmidt*, ¶ 8 (footnotes omitted). The Supreme Court further stated that such a clause "will *never* avail to relieve a party from liability for intentional, willful or fraudulent acts or gross, wanton negligence." *Id.* ¶ 9 (footnote omitted).

¶ 9 As to the first hurdle, the Supreme Court explained that

> both the identity of the tortfeasor to be released and the nature of the wrongful act—for which liability is sought to be imposed—must have been foreseen by, and fall fairly *within the contemplation of*, the parties. The clause must also identify the type and extent of damages covered—including those to occur *in futuro*.

*Id.* ¶ 10 (footnotes omitted). As to this first hurdle, we find instructive and in harmony with *Schmidt* the explanation given by the Supreme Court of Connecticut, as follows:

> there exists widespread support in other jurisdictions for a rule requiring that any agreement intended to exculpate a party for its own negligence state so expressly ... and ... this court previously ha[s] acknowledged the well-established principle ... that [t]he law does not favor contract provisions which relieve a person from his own negligence .... Accordingly, we determined [in prior opinions] that the better rule is that a party cannot be released from liability for injuries resulting from its future negligence in the absence of language that expressly so provides. This rule prevents individuals from inadvertently relinquishing valuable legal rights and does not impose ... significant cost[s] on entities seeking to exculpate themselves from liability for future negligence.

*Hanks v. Powder Ridge Rest. Corp.*, 276 Conn. 314, 885 A.2d 734, 737–38 (2005) (internal quotation marks omitted) (citations omitted).

¶ 10 For example, the *Hanks* Court discussed the earlier case of *Hyson v. White Water Mountain Resorts of Connecticut, Inc.*, 265 Conn. 636, 829 A.2d 827 (2003), which involved the activity of "snowtubing." In *Hyson*, the plaintiff signed an exculpatory agreement prior to snowtubing; however, as explained by the *Hanks* Court,

> the release signed by the plaintiff [did] not specifically refer to possible negligence by the defendant but, instead, only referred to inherent and other risks involved in [snowtubing] .... Thus, [a] person of ordinary intelligence reasonably could believe that, by signing this release, he or she was releasing the defendant *only from liability for damages caused by dangers inherent in the activity of snowtubing*.

*Hanks*, 885 A.2d at 738 (emphasis added) (internal quotation marks omitted) (citations omitted) (footnote omitted). Thus, again as explained by the *Hanks* Court, the *Hyson* Court "concluded that the exculpatory agreement did not expressly release the defendants from liability for *future negligence* [of the snowtube operator] and, therefore, did not bar the plaintiff's claims." *Hanks*, 885 A.2d at 738 (emphasis added).

¶ 11 By contrast, in *Hanks*—a case which also involved the activity of snowtubing—the exculpatory agreement explicitly stated, inter alia, "that the snowtuber *'fully assume[s] all risks associated with [s]nowtubing*, even if due to the NEGLIGENCE' of the defendants. (Emphasis in original.) Moreover, the agreement refers to the negligence of the defendants three times ...." 885 A.2d at 740. On review of the exculpatory agreement in *Hanks*, the Supreme Court of Connecticut "conclude[d] that the agreement expressly and unambiguously purports to release the defendants from prospective liability for negligence." *Id.*[2] This conclusion is consistent with, and helps to elucidate, the first "hurdle" set forth in *Schmidt*,[3] which requires,

---

**2.** Consequently, the *Hanks* Court proceeded to address the issue left unresolved in *Hyson*: "namely, whether the enforcement of a well drafted exculpatory agreement purporting to release a snowtube operator from prospective liability for personal injuries sustained as a result of the operator's negligent conduct violates public policy." *Hanks*, 885 A.2d at 741.

**3.** As explained by a separate division of this Court in *Burd v. KL Shangri–La Owners, L.P.*, 2003 OK CIV APP 31, 67 P.3d 927, "*Schmidt* did not directly rule on an example of an exculpatory contract," and was issued by the Oklahoma Supreme Court in response to "certified federal questions of law as to how [courts applying Oklahoma law] should analyze such a contract." *Burd*, ¶ 8.

among other things, that the release clearly describe "the nature of the wrongful act" to be protected. *Schmidt*, 1996 OK 29, ¶ 10, 912 P.2d 871.

■ ¶ 12 The agreement in the present case explicitly provides that "EACH OF THE UNDERSIGNED"

> RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoter, participants, racing association, ... track operator, track owner, officials, car owners, drivers, pit crews, ... owners and lessees of premises used to conduct the event and each of them, their officers and employees, all for the purposes herein referred to as "releasees," from all liability to the undersigned ... for any and all loss or damage, and any claim or demands therefor on account of injury to the person or property or resulting in death of the undersigned, whether *caused by the negligence of the releasees* or otherwise while the undersigned is in or upon the restricted area, and/or, competing, officiating in, observing, working for, or for any purpose participating in the event[.]

(Emphasis added.) Indeed, as in *Hanks*, the agreement refers to the negligence of Defendants not once, but three times. For example, in addition to the above, the agreement also states that the undersigned "HEREBY ASSUMES FULL RESPONSIBILITY FOR AND RISKS OF BODILY INJURY, DEATH OR PROPERTY DAMAGE *due to the negligence of releasees* or otherwise while in or upon the restricted area and/or while competing, officiating, observing, or working

for or for any purposes participating in the event." (Emphasis added.)[4]

¶ 13 As quoted above, the release also describes with particularity the entities and individuals protected under the release, including all Defendants. In Combs's petition, he describes Defendant West Siloam Speedway Corporation as "the entity owning and operating the racetrack"; he describes Defendant Rick Magnuson as "a Co–Owner" and "manager of West Siloam Speedway"; he describes Defendant Julie Magnuson as "a Co–Owner"; he describes Defendant Joey Vaughn as having "leased and/or operated" the Speedway at the time of the accident; and he describes Defendant Ed Nunn as "the operator of the vehicle that struck [Combs][.]" In turn, the release in this case identifies, as protected parties, "owners ... of [the] premises," as well as the "track operator" and "track owner." It further identifies, as protected parties, "lessees of premises" in addition to "car owners" and "drivers." The release clearly demonstrates an intent to relieve all the Defendants named in the petition from fault for negligence. Accordingly, we conclude the release in this case passes the first hurdle set forth in *Schmidt* because it specifically refers to the identity of all Defendants (including the track operator, track owner, drivers, etc.), specifically exculpates Defendants from liability for negligence, and it identifies the type and extent of damages—bodily injury to any participants, observers, or those working for any purpose within the infield area resulting

---

4. We note that the language of the release and the other facts and circumstances presented in this case are entirely distinguishable from those addressed in *Burd v. KL Shangri–La Owners, L.P.,* 2003 OK CIV APP 31, 67 P.3d 927. In *Burd*, the plaintiff was injured while participating in a tennis tournament held at a hotel (Shangri–La). The plaintiff tripped over rolls of carpet stored next to the tennis court. Evidence was presented that, among other things, the plaintiff, "when she executed the waiver at the beginning of the tennis season, ... had no idea she would be playing league tennis at Shangri–La." *Id.* ¶ 7. In fact, the *Burd* Court explained:

> (1) [the plaintiff] did not know she would be playing at Shangri–La; (2) the identity of the tortfeasor was not known to her at the time of the contract; (3) there was no intent, and thus no meeting of the minds, to exculpate Shangri–

La; and (4) the language of the exculpatory contract is vague and ambiguous.

*Id.* ¶ 8. The *Burd* Court further explained:

> In the instant case, the identity of the possible tortfeasor is unclear, over broad, unnamed, and unknown. Further, the waiver fails to identify the risks being waived, the duration of the waiver, and is arguably ambiguous, given the fact that [the plaintiff's] signature could be construed as an acknowledgment of the rules of the tennis league, of the waiver of liability, or merely of an indication that she wished to be part of a particular tennis team.

*Id.* ¶ 11. Therefore, the *Burd* Court held, "as a matter of law, that the general, non-specific release of 'any facility' was insufficient under *Schmidt* to relieve Shangri–La from liability." *Id.* ¶ 7.

from the negligence of Defendants—covered by the release.

¶ 14 Thus, we must now turn to the remaining hurdles set forth in *Schmidt*. As to the second hurdle, which serves to defeat exculpatory agreements entered into between parties with a vast difference in bargaining power, the *Schmidt* Court explained,

> Courts consider two factors when called upon to ascertain the equality of the parties' bargaining power, vis-à-vis each other, in the setting of a promissory risk assumption: (1) the importance of the subject matter to the physical or economic well-being of the party agreeing to the release and (2) the amount of free choice that party could have exercised when seeking alternate services.

1996 OK 29, ¶ 11, 912 P.2d 871 (footnote omitted). Even when viewing the facts in the light most favorable to Combs, there exist neither facts nor reasonable inferences in Combs's favor with regard to the first of these two factors. That is, the subject matter at issue—attending a car race at a speedway—is plainly not of any significant importance to the physical or economic well-being of Combs who states in his deposition he was not even a volunteer, much less an employee, at the time of the accident, and who states he was simply in the infield area to observe the race without having to pay for a stadium ticket.

¶ 15 Furthermore, as to the second factor, Combs was not seeking any "services" at the Speedway; instead, he was merely there for entertainment. Thus the second factor does not even apply. However, even assuming the second factor has some application, Combs admits he could have watched the race from the stadium seats around the track, and that, as stated above, the only reason he observed the race from the infield was to avoid paying the price of a stadium ticket. We conclude the release in this case passes the second hurdle set forth in *Schmidt*.

¶ 16 The third hurdle provides that "enforcement of these clauses must never (a) be injurious to public health, public morals or confidence in administration of the law *or* (b) so undermine the security of individual rights vis-à-vis personal safety or private property as to *violate public policy*." *Schmidt*, ¶ 8

(footnote omitted). The Supreme Court exhorted future courts applying Oklahoma law to declare such agreements void as against public policy "*only with great caution*." *Id.* ¶ 12 (footnote omitted). The Court then explained:

> Two classes of exculpating agreements may be said to violate public policy: (1) those which—if enforced—patently would tend to injure public morals, public health or confidence in the administration of the law and (2) those which would destroy the security of individuals' rights to personal safety or private property.

*Id.* (footnote omitted).

¶ 17 We conclude that the release in this case—a release signed by one entering the infield area of the Speedway to watch the car race and/or volunteer—falls within neither of these two classes. Enforcement of the release at issue to bar Combs's claims of negligence would not, in any patent way, "injure public morals, public health or confidence in the administration of the law," such as might occur if a release "exonerating a *common carrier* from liability for negligence" were given effect. *Id.* ¶ 12 n.22 (citation omitted). Furthermore, it would not "destroy ... rights to personal safety or private property." *Id.* ¶ 12. Combs could have simply opted not to enter the infield area of the Speedway, a decision which would not have resulted in the loss of any significant "rights" whatsoever. Furthermore, as set forth in *Schmidt*, and as we discuss in more detail in the following section of this Opinion, although Combs chose to sign the release and enter the infield area, he did not assume the risk of injury or damage that might result from acts and omissions of Defendants amounting to more than ordinary negligence. We conclude enforcement of the release in this case does not violate public policy and, therefore, the third hurdle set forth in *Schmidt* is satisfied.

¶ 18 In summation, the release in this case is valid and enforceable. It is undisputed Combs signed the release prior to entering the infield area of the Speedway on the date of the incident in question. The release is plainly entitled at the top of a one-page form: "RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT,"

and it contains, among other things, the language quoted and discussed above. We conclude that no genuine disputes of material fact exist in this regard and that the release bars all of Combs's negligence claims asserted against Defendants.

## II. Assertion of More than Ordinary Negligence

¶ 19 In addition to asserting Defendants were negligent—assertions which are barred by the exculpatory agreement, as discussed above—Combs also asserts in his petition that he was injured "as [a] direct result of the ... recklessness of [Defendants][.]" He asserts "the actions and/or omissions of [Defendants] were of such a nature so as to constitute conduct evidencing reckless disregard for the rights of others," including Combs, and he seeks punitive damages as a result of Defendants' allegedly reckless conduct.

 ¶ 20 Not only does the exculpatory agreement in this case fail to clearly set forth a release of liability for recklessness or gross negligence, but, as quoted above, the Oklahoma Supreme Court has already determined that an exculpatory agreement "will *never* avail to relieve a party from liability for intentional, willful or fraudulent acts or gross, wanton negligence." *Schmidt*, 1996 OK 29, ¶ 9, 912 P.2d 871 (footnote omitted). "Gross negligence is characterized as reckless indifference to the consequences." *Myers v. Lashley*, 2002 OK 14, ¶ 22, 44 P.3d 553 (footnote omitted). Gross negligence "falls short of an intentional wrong's equivalent," but "may support a punitive damages assessment[.]" *Id.* (footnotes omitted).

¶ 21 In the context of a case involving an injury to a member of a pit crew at a motor speedway, the Supreme Court of South Dakota explained, in a manner consistent with Oklahoma law, that "releases that are construed to cover willful negligence or intentional torts are not valid and are against public policy. Willful and wanton misconduct is something more than ordinary negligence but less than deliberate or intentional conduct." *Holzer v. Dakota Speedway, Inc.*, 610 N.W.2d 787, 793 (S.D. 2000).

¶ 22 The *Holzer* Court explained that the plaintiff

alleged in his complaint that [the] [s]peedway acted "negligently and with reckless disregard toward his life, safety, and health" by failing "to provide adequate protection from the racetrack for the individuals in the pits, they failed to warn individuals in the pits of the potential dangers, and they located the pits in an unsafe, unprotected and unsecured area."

610 N.W.2d at 793. The *Holzer* Court explained:

Conduct is gross, willful, wanton, or reckless when a person acts or fails to act, with a conscious realization that injury is a *probable*, as distinguished from a *possible* (ordinary negligence), result of such conduct. The Restatement (Second) of Torts § 500 (1965) defines the recklessness standard as:

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable [person] to realize not only that his conduct creates an unreasonable risk of physical harm to another, but also such risk is substantially greater than that which is necessary to make his conduct negligent.

Thus, for [the plaintiff] to prevail under a theory of recklessness, and to place [the] [s]peedway's conduct outside the coverage of the release, a question of fact must exist that [the] [s]peedway acted with a conscious disregard of an unreasonable and substantial risk of serious bodily harm to another.

*Holzer*, 610 N.W.2d at 793 (internal quotation marks omitted) (citations omitted).

¶ 23 In *Holzer*, "[t]he right wheel and tire broke away from a race car, became airborne, and flew over one hundred feet to where [the plaintiff] was standing inside the official pit area .... He received severe injuries ...." 610 N.W.2d at 789–90. The *Holzer* Court concluded the plaintiff "failed to provide any evidentiary support for a claim of willful or reckless acts that would place [the] [s]peedway's conduct outside the coverage of the release." *Id.* at 794.

¶ 24 In the present case, Combs asserts in his petition that he was injured as a result of being directly struck by a race car, and he asserts that Defendants were negligent, but also reckless, "in failing to have barriers set up to prevent out of control vehicles from entering the infield[.]" Combs states in his deposition testimony that "nothing major" separated the racetrack from the surface of the infield where he was standing at the time of the accident. He states that although there were "tires here and there to stop the cars from coming in too far and moving the race track in," and although there was a tank full of water "used to ... cool cars off," there were otherwise "no barriers, no. Nothing like that." When questioned at his deposition whether he could "think of anything the track could have done that would have prevented what happened to [him]," Combs responded, "A barrier of some sort. I know the track at Pea Ridge, the track at Fort Smith both have walls around the infield."

¶ 25 Nevertheless, the question remains whether a "substantial controversy" exists [5] as to whether one or more of the Defendants acted recklessly or with gross negligence; i.e., whether one or more of the Defendants acted with a *conscious disregard of an unreasonable and substantial risk* of an out-of-control race car coming into the infield area and causing serious injury to those observers or volunteers, like Combs, allowed into the infield area of the Speedway.

▮ ¶ 26 To answer the question whether a substantial controversy or genuine dispute of material fact exists in this case with regard to this particular issue, we are limited to a review of the evidentiary materials actually presented in this case. "[A] summary judgment ruling must be made on the record actually presented by the litigants, not on a record potentially possible." *Prudential Ins. Co. of Am. v. Glass*, 1998 OK 52, ¶ 3, 959 P.2d 586 (citation omitted).

▮ ¶ 27 In the present case, it is undisputed that Combs, who was a father of a five year old at the time of the accident, had "been going to [the Speedway] to watch the races since he [i.e., Combs] was six or seven years old." (Emphasis added.) It is also undisputed that, during "[t]he year to year-and-a-half prior to the accident, [Combs] spent most weekends volunteering to help in the infield area of [the Speedway][.]" During this time period leading up to the accident, Combs testified he attended thirty-five to forty races at the Speedway. However, as Combs's counsel asserted at the hearing on Defendants' motion for summary judgment, "while there may be wrecks on the track, [Combs] had seen wrecks on the track, he had never seen somebody injured in the infield area where spectators [such as Combs] are allowed." (Emphasis added.)

¶ 28 Combs was also questioned at his deposition, "prior to that night, ... had anything like that happened? And when I say 'like that,' a car uncontrollably going through the infield and hitting someone. Had that ever happened?" Combs responded, "Not that I know of." When questioned whether "it's fair to say that you thought the infield was a relatively safe place to be," Combs responded, "Well, yeah." Combs further explained he felt safe because the infield, where he was standing at the time of the accident, is "150, 200 feet across or better." Thus, he stated: "So, yes, I did think it was a safe place to be."

¶ 29 Even assuming evidence has been presented which might support a finding of ordinary negligence against one or more of the Defendants, Combs, as "[t]he party responding to [the] motion for summary judgment," has the "obligation to present something which shows that when the date of trial arrives, he will have some proof to support his allegations"[6] that Defendants acted with a conscious disregard of a *substantial* risk of a

---

"If it appears to the court that there is no *substantial controversy* as to the material facts and that one of the parties is entitled to judgment as a matter of law, the court shall render judgment for said party." Okla. Dist. Ct. R. 13(e), 12 O.S. Supp. 2013, ch. 2, app. (emphasis added). District Court Rule 13 also describes the fundamental issue at the summary judgment stage as whether a *"genuine issue"* of material fact exists. *See* Okla. Dist. Ct. R. 13(a) & (b) (emphasis added). *See also Hadnot v. Shaw*, 1992 OK 21, 826 P.2d 978 (using both the term "genuine fact issue" and the term "substantial controversy" in an appeal from a grant of summary judgment).

*Davis*, 1989 OK 146, ¶ 12, 782 P.2d 924.

race car uncontrollably going through the infield of the Speedway and hitting someone. We can locate no evidence in the record that might show Combs was at a *substantially greater risk of physical harm* than that which would be necessary to make Defendants' conduct merely negligent. *Holzer*, 610 N.W.2d at 793 (citing The Restatement (Second) of Torts § 500). In fact, Combs and his counsel have both consistently asserted in the record that despite Combs attending races at the Speedway since he was a child, despite his undisputed life-long familiarity with the Speedway, and despite attending races "most weekends" during the year-to-year-and-a-half period prior to the accident, Combs had no knowledge of any similar incident ever having occurred in the infield area. Moreover, apart from Combs's deposition testimony—testimony which supports no other inference than that the risk of the accident occurring was *not* a substantial one—Combs has presented no other evidentiary material pertaining to this issue.

■■■ ¶ 30 One item of evidence does remain which potentially raises a fact issue as to recklessness: Combs's testimony, quoted above, that two other racetracks of which he is aware "have walls around the infield." However, in order to reverse the trial court's grant of summary judgment to Defendants, it must appear there is a "substantial controversy" as to the issue of recklessness, for, as noted above, in the absence of any substantial controversy as to the material facts, summary judgment must be rendered to the party entitled to judgment as a matter of law. Dist. Ct. R. 13(e), 12 O.S. Supp. 2013, ch. 2, app. "A party responding to summary judgment has an obligation to present some material that shows a trial is necessary." *State ex rel. Pruitt v. Native Wholesale Supply*, 2014 OK 49, ¶ 29 n.15, 338 P.3d 613 (citing *Davis*, 1989 OK 146, ¶ 12, 782 P.2d 924). Apart from this portion of Combs's deposition testimony—a deposition which

was taken in March of 2014, well over a year prior to Combs filing his response to Defendants' motion for summary judgment in May of 2015—Combs has not attached any other evidence pertaining to his allegation of recklessness. Indeed, as discussed above, Combs's deposition testimony—aside from this passing assertion that two other racetracks have walls around their infields—can be summarized as asserting that the accident was a highly unusual, unlikely or unexpected event of which he therefore could not possibly have assumed the risk.[7]

¶ 31 We conclude no genuine dispute of material fact exists that the particular risk of being struck by a race car in the infield area of the Speedway was a probable and substantial one which Defendants consciously disregarded. Instead, the uncontroverted evidence submitted is that, over a decades-long period, this was the first known incident of its kind in the infield area of the Speedway, and the risk was not substantial. Combs has failed to present any material that shows a trial is necessary on the issue of whether one or more Defendants acted with "reckless indifference to the consequences." *Myers*, 2002 OK 14, ¶ 22, 44 P.3d 553 (footnote omitted). Therefore, we conclude summary judgment was properly granted to Defendants on Combs's theories of recklessness.

### CONCLUSION

¶ 32 We conclude the release signed by Combs prior to entering the infield area of the Speedway bars his negligence claims. We further conclude summary judgment was properly granted to Defendants on all remaining claims—i.e., allegations of more than ordinary negligence—because Combs has failed to demonstrate a substantial controversy exists as to whether Defendants were reckless with regard to the risk of an out-of-

---

7. This would appear to explain why Combs had seemingly abandoned his theory of recklessness in his response to, and at the hearing on, Defendants' motion for summary judgment. That is, Combs (and/or his counsel) may have concluded that if he took the position that the risk of injury was *substantial*, it would defeat his ability to pursue his negligence claims founded, as they would apparently need to be, upon an argument

that Combs did not assume the risk (assuming Combs could defeat the enforceability of the release). Regardless, because we concluded, above, that the release is valid and enforceable as to negligence, and because we conclude, in this section of the Opinion, that no substantial controversy exists as to recklessness, we need not

control race car going through the infield area of the Speedway. Therefore, we affirm.[8]

¶ 33 **AFFIRMED.**

THORNBRUGH, V.C.J., and WISEMAN, J., concur.

further address the issue of assumption of the risk.

8. We note that Combs also attached to his Petition in Error the trial court's "Journal Entry of Judgment on Defendants' Counterclaims" in which the trial court awarded Defendants costs "in the amount of … $1,070.00, the statutorily recoverable costs incurred in prosecuting their counterclaims," but denied all requests for an award of attorney fees. However, Combs does not contest these additional determinations.